Howuv, J.,
delivered the opinion of the court:
This suit has its origin in a marine collision, or a series of collisions, on the navigable waters of the Mississippi Biver, in the port of New Orleans, between towboats propelled by a steamer called the Future City, belonging to the plaintiff company, and war vessels belonging to the United States. The gravamen of the action is the negligence of the naval officers in command of the vessels, and damages' are claimed for the total loss and destruction of two of the towboats and for the amount expended in repairing a third barge as the result of the collision, and also for the amount of the freight earnings *264 lost in consequence of the collision, the whole damages claimed being $24,308.85.
Jurisdiction to hear and determine to judgment the claim was conferred upon this court by an act of Congress approved August 3, 1894 (28 Stat. L., p. 219), in'the following language:
• uBe it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the claims of the legal or equitable owners or claimants of the steam towboat Future City, her barges in tow, cargoes thereon, freight, and personal effects contained in them alleged to have been sunk, lost, or greatly damaged by collision with the United States vessels of war Atlanta, Galena, and Richmond, in the Mississippi River, at the city of New Orleans, on or about the seventh day of May, eighteen hundred and eighty-eight, be referred to the Court of Claims, with jurisdiction and authority to hear and determine the same to judgment, with the right of appeal, as in other' cases: Provided, That no suit shall be brought under the provisions of this act after six months, from the date of the passage thereof: And provided-further, That no judgment shall be rendered against the Government unless it shall affirmatively appear from the evidence adduced that such collision was the result of negligence on the part of the officers in command of said vessels of war.”
The first question is the character of the special act under which the case, has been referred and the rules which must govern in determining the rights of the parties. The claimant contends that the rules observed by all courts of law, equity, and admiralty where negligence is charged shall obtain. The defendants, on the other hand, contend that the last proviso to the jurisdictional act establishes rules materially different from those which obtain in admiralty courts; that the additional proviso was intended to compel the plaintiff to prove the negligence of the officers of the war vessels beyond any reasonable doubt; that, even if the collision was the direct and proximate result of the negligence of the officers mentioned, yet if the moving craft of the plaintiff was guilty of any negligence whatever that contributed to the disaster the plaintiff can not recover.
Without statutes conferring jurisdiction the courts have no authority to consider cases of wrong arising in maritime collisions caused by 'Government vessels, inasmuch as the United States are not liable for the torts of their officers or agents except as they consent to be. But Congress have repeatedly recognized the obligation of the Government to compensate for injuries occasioned by the negligence of its agents. The *265 legislative authority has been invoked time and again to give redress in some form or other, and this court has been used as the instrument of Congress in dealing with such cases. (Sampson v. United States, 12 C. Cls., 14., 480; Jane Carroll et al. v. District of Columbia, 22 C. Cls., 14., 104; Joseph Irwin v. United States, 23 C. Cls. R., 154; Walton et al. v. United States, 24 C. Cls. R., 372.)
The principle on which liability rests in cases of a similar character is the same as that which at common law obtains between private persons. This principle was well stated from the Committee on Claims by Mr. Lanliain in a report to the Fiftieth Congress to be the responsibility of the property owner for the management and use of- his property. That report was made to compensate certain claimants for the loss sustained by them in the destruction of their property as the result ol' the negligence of Government agents in omitting to place a proper and customary light on a pier which the Government was constructing on a navigable river, and resulted in the passage of an act which brought the matter to this court for determination. The direction was simply given there “ to hear and determine” the claim to judgment, with the right of appeal, as in other cases. (Walton et al. v. United States, supra.) The act referring the present case provides that no judgment shall be rendered against the Government unless it shall affirmatively appear from the evidence that the collision was the result of negligence on the part of the officers in command of the war vessels. This requirement imposes upon the plaintiff the duty of affirmatively showing the negligence of the officers mentioned to have been the proximate cause of the collision. Without this there can be no recovery. Liability is neither increased nor diminished by the proviso.
The act does not impose upon the plaintiff the burden of establishing the negligence of the officers of the war vessels beyond any reasonable doubt. Grime is not the issue, and the rule invoked has no application in a civil action where mere negligence is charged and tort is the gravamen of the complaint. The requirement is fully met if the claimant satisfies the court that the negligence of the officers was such as to cause the collision without any corresponding negligence on the part of those in charge of the tow directly contributing to the result. The thing intended is legal relief for acts of negligence resulting in injury to the plaintiff; redress of wrongs *266 for which compensation will be made when proved. The matter of negligence being- thus submitted, qualified only as to how it must be made to appear, the last proviso invested the plaintiff with all such rights as existed at common law in determining liability in cases of a similar character between others. The restrictive words, if they may be called such, are unappreciable, because it is just as much the duty of the plaintiff to affirmatively show the negligence of the defendants without them as it is with them.
Ordinarily, it is a sufficient defense to show that the plaintiff himself was guilty of negligence that- contributed to the injury. If the defendants, their negligence being established, allege that plaintiff’s officers or servants were negligent and contributed to the injury, then the burden of proof rests upon the defendants to show that the plaintiff was also negligent, and to such an extent that their conduct directly contributed to the injury. This rule has been declared to be in accord with the uniform course of decision in the Supreme Court. {Inland and Seaboard Coasting Company v. Tols on; 139 U. S. B., 557, and authorities cited.) These decisions have been followed by another, which declares that where the facts make the same applicable there is a qualification to the rule respecting negligence of the plaintiff, in that the contributory negligence of the plaintiff would not exonerate the defendants if the defendants by the exercise of reasonable care and prudence might have avoided the consequences of plaintiff’s negligence. (Grand Trunk Railway v. Ives, 144 U. S. R., 408.)
The admiralty rule of an equal division of damages in the case of collision between two vessels when both are in fault contributing to the collision has long prevailed in England and this country. (The Max Morris, 137 U. S. R., 1.) But at common law the general rule is that if both vessels are culpable in respect of faults operating directly and immediately to produce the collision, neither can recover damages for injuries so caused. (Atlee v. Packet Co., 21 Wall., 389; Belden v. Chase, 150, U. S. R., 691.) Therefore, under the terms of the special act in this case, the damages can not be divided, even if the proof establishes direct mutual fault. The plaintiff is entitled to all the damages proved to have been sustained or to nothing.
For the purposes of this case, then, it is sufficient to say that if contributory negligence clearly appears on the part of the plaintiff of such character as directly produced the result, the *267 plaintiff can not recover. But any mismanagement of the tow, or mere mistake of judgment on the part of her officers and crew at the critical period in the history of the collision, not the direct and proximate cause of it, will not relieve the negligence of the defendants. Where the fault on one side is flagrant and the other so trivial as to leave it doubtful whether •there was fault on the latter’s part or not, the benefit of the doubt must be given to the vessel charged with contributing to the injury. {The Grace Girdler, 7 Wall., 196; The Great Republic, 23 Wall., 20; Spencer Mar. Col., 338.) And if the fault of the one vessel is established sufficiently to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. (The City of New York, 147 U. S. R., 72.)
The plaintiff’s case is that the collision (there were several collisions, but as they all-happened about the same time and from the same cause we will deal with them all as one collision) resulted from and was occasioned by the negligence of the officers in command of the United States vessels in bringing them to anchor (1) in improper and unlawful positions and in an improper manner, and (2) in remaining at anchor in such positions and in such, manner.
A vessel in motion is bound to avoid one lying at anchor as far as it can do so.
The plaintiff’s tow being in motion, the presumptions are with the defendants in fixing the blame. But these are mere presumptions, which can not be allowed to prevail against the ascertained and established facts. (Fresh v. Gilson, 16 Pet., 327; Lincoln v. French, 105 U. S. R., 614.)
If a vessel at rest is moored in an uulawful situation the burden of proof is upon it to show that the collision did not occur by reason of its exposed or uulawful situation (Spencer Mar. Col., sec. 120), but that it did occur by reason of the negligent conduct of the plaintiff.
Where one vessel, clearly shown to have been guilty of a fault, adequate in itself to account for a collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can only be rebutted by clear proof of a contributing fault. (The Oregon, 158 U. S. R., 187.)
With these principles in view, the questions respecting the negligence of the vessels arise on the findings, which determine the legal consequences.
*268 The United States vessels were ranged in an irregular line below a point of land opposite Celeste street, the Atlanta being-highest up the stream and two squares below the Richard Street ferry. The Galena was next to it below; then, in the order named, the Ossipee, the Yantic, and the Richmond, the latter being at a point somewhat above but nearly opposite the barge landing.
The vessels were apart sufficiently far to extend the entire fleet down the river for the distance of about one mile. At Celeste street the shore extends into the river to a sharp point, and the river bends from that point to the north. Just below the width of the stream is about 1,800 feet. The men of-war were lying along the western shore of the river at distances ranging from 350 to 600 feet. The location of the Atlanta, 600 feet from the New Orleans shore, put that vessel in the track of tows entering the harbor from above. It was in the pathway of a tow of even less length than plaintiff’s, at that iiarticular place engaged in flanking down to the landing, because of the necessity for any tow trying to land to push out into the river to round the point opposite Celeste street. The upper vessel was at the entrance to the busy part of the harbor, and in its entirety the fleet was located in the wray of all vessels descending to the neighborhood of the barge landing.
On the part ,of the defense we are referred to some authorities which, it is claimed, tend to show that the anchorage taken was not improper. (The Indiana, Abbott’s Admy. Rep., 330; The Ceuelberg, 3 Wood’s Cir. Ot. Rep., 32; The Ogemaw, 32 Fed. Rep., 920; Culbertson v. Shaw, 18 How., 585, noticed later on.) Without noticing these cases in detail, it is enough to say that they do not prove the right of one vessel to unnecessarily get in the track of others at points where, from the nature of things, collision is nearly inevitable to those trying to enter a harbor without knowledge of the anchorage of other craft in improper and dangerous positions.
The law of the road is well-nigh universal. It applies with greater particularity, if anything,- to the thoroughfares of rivers and the sea than to land. Intended for the free and unrestricted use of all, roadways are expected to be kept open. Ordinary prudence and caution suggest that none shall unreasonably stop in the pathway; or, if by chance this be done, that- the improper position so taken be abandoned as early as practicable. So necessary to the safety of travel is *269 this rule, obstructions in navigable waters within the States are dealt with as nuisances and indictable as offenses against the laws. When, in disregard of the rights of others, vessels negligently and carelessly come to anchor in the track of passing vessels, the owners of such craft must be held responsible for the consequences. Government agents can no more be exempt from the requirements imposed upon private individuals in this regard than persons without such responsibility. Sound public policy, as well shown by an able report of a Senate committee on this subject once submitted by Senator Hoar, requires the United States and all sovereign Governments to hold themselves responsible for injuries, where the private rights of the citizen have been violated by the negligence of public officers. The common injury occasioned to a private person by the carelessness of the driver of a mail wagon or other vehicle passing through the street and engaged in the business of the Government has been thought to be the subject of responsibility upon every consideration of public policy and justice. Oases of injury occasioned by Government agents on the water are peculiarly within the rule of responsibility, (Cong. Bee., Fiftieth Cong., first sess., part 1, 465). The rules of navigation are ordained and required to be observed to save life and property employed in marine pursuits and not to promote collisions or to justify the wrongdoer where disasters occur. (The Sunnyside, 91 U. S. R., 210; The Hasbrouck, 93 U. S. R., 406.)
The abstract right of the Government’s officers to run the vessels in their charge anywhere in bur navigable streams and come to anchor in harbors is just as great as the right of other vessels to do the same thing. The only difference that can be suggested in this respect consists in the privilege of place of anchorage. Those possessing slips or wharfage rights (usually obtained for a consideration) may occupy such places to the exclusion of others, but the rights of all are the same in using the harbor, subject to the rules and regulations prescribed by proper local authority,' and the rules of navigation in approaching and leaving its waters. When a vessel has committed a positive breach of a rule she must show, not only that probably her fault did not contribute to the disaster but that it could not have done so. (The Pennsylvania, 19 Wall., 125, 136; Richelieu Navigation Co. v. Boston Ins. Co., 136 U. S. R., 422; Belden v. *270 Chace, 150 U. S. R., 699.) This rule may be considered of proper application in a case where, in positive disregard of local authority, masters of vessels have stationed them where injury was done to those unaware of their presence.
The authorities relating to the anchoring of vessels in positions where proper and customary navigation is rendered more difficult and dangerous, or where such anchorage adds to the difficulties existing and produced by natural causes, impute negligence and culpability to those coming to anchor in such places under such circumstances. Thus, it is negligence for a vessel to anchor so near the entrance to a harbor that shipping-entering in stress of weather is liable to become embarrassed by its presence; and where the usual difficulties of navigation make the entrance to a harbor a dangerous undertaking, it is especially reprehensible for a vessel to moor in a situation tending to increase those difficulties. (Spencer, Mar. Col., sec. 99, and authorities cited.) So if a vessel is at anchor in a proper place, but is observant of the precautions required by law, it is not liable for damages sustained by a vessel in motion colliding with it; but where it anchors in an unlawful position or fails to observe the statutory requirements and such other precautions as good seamanship suggest, it must suffer the consequences. [Ibid., sec. 106; The Jeremiah Godfrey, 17 Fed. R., 738; Strout v. Foster, 1 How., 89; The Buffalo, 55 Fed.R., 1019; The John H. May, 52 Fed. R., 882.) Liability for getting-in the way of an entrance to a harbor, whereby a moving vessel vras injured, was distinctly recognized by the Supreme Court in the case of the Brig James Gray v. The Ship John Fraser (21 How., 187), where a vessel was being towed into port by a steam tug and came into collision with a vessel at anchor in the thoroughfare at a place where vessels bound out usually anchored for a short time to make final preparations for sailing on their voyage. While the vessel at anchor was not held liable on the ground that the lax execution of the regulations of the port had become a usage when the harbor was not overcrowded, and the harbormaster had acquiesced in single vessels anchoring in the thoroughfare, and the interpretation of the ordinance of the local authorities could not be more rigidly interpreted and enforced by the courts than by the authorities themselves, yet the decision lends emphasis to the general rule and settles it.
Being without anchorage grounds of their own, it was the *271 duty of the commanders of the war vessels, if they had control of the matter, to anchor with reference to the conditions existing in a busy harbor, not merely for the protection of the Government property in their charge, but for the safety of others. The vessels did not anchor at any wharf, but did stop at unusual places in the river directly in the pathway all vessels necessarily had to take to make their landings, and remained there for two days and until the collision, although there was plenty of room elsewhere in the harbor. Good holding ground for vessels to anchor at all times existed within 20 feet of the Algiers shore and out of the way of vessels coming to port.
If the anchorage selected was safe and proper for two day's it was so for a longer time, and if there was nothing improper in the selection, then vessels of every kind had the right to anchor in the same positions and places at every opportunity. The Eichmond must have been very much in the way of all vessels passing to or from the city side of the river with knowledge of her position, while to those without knowledge of it or to those navigating in the fog her position was extremely dangerous. No tow could make a landing in that vicinity while the Eichmond remained in her position. The entire fleet was a source of danger to unwary shipmasters coming into the harbor both from above and below. The Atlanta, just below the head of Celeste street, was more directly in the way of descending boats than the others. From her peculiar position she was consequently more difficult to pass by vessels coming from above than the other ships, and more dangerous to them than at any other anchorage that might have been selected. All the ships were anchored with a single chain and swinging to some extent.
If the Galena had not sheered in at the time of the collision with barge 68," that much of the accident would not have occurred. Where a steamer is wrongfully in dangerous proximity to a flatboat and the proximate cause of a collision is an unexpected sheer given to a flatboat by añ eddy, the steamer is in fault and must bear the whole loss. {Fritz v. Bull, 12 How., 40(1.) This was held in a case where the flatboat was, from the time of its discovery by the steamer, in the proper channel of downward navigation floated onward only by the current. The flatboat being in an eddy and unable to direct its course with the same degree of certainty and promptness as a steamer, and the steamer’s pilots having disregarded the *272 consequences wliicli eddies might produce, the loss was put upon the steamer.
When war vessels visited the port of New Orleans on occasions previous to the collision they anchored from Canal street down to the custom-house, or in that vicinity, but on no occasion or at any time were they ever anchored just below the bend of the river near Celeste street, as in this instance.
Immediately below and under the point on the Algiers side of the river, above which there was a convenient, safe, and proper place for vessels to anchor, there is a strong eddy. Vessels coming from the south all como through that eddy, striking the current at the point; then they headquarter over to the city side close along the shipping to make their landings. Thus, the men-of-war were in the passageway of the customary route of ascending vessels seeking to land at any point above the location of the Eichmond. The danger to an ascending boat would not be so great as to one descending, as an ascending boat could check its headway at will, but with a descending boat engaged in the attempt to land opposite or just below the anchored vessels with head downstream, there would be an apparent necessity for such boat to keep close to the landing shore to avoid the currents and eddies that would carry the boat trying to land either down or across the river.
The places selected by the men of-war to stop made them more dangerous to passing vessels than if such vessels were ■steaming in the harbor. So much more dangerous may a vessel lying motionless on the water sometimes be over one under way, it has been held that a vessel may be at fault for lying still in the water only a minute and a half. (The Britannia; The Beaconsfield, 153 U. S. R., 130, 137.) Fault was found, it is true, in such a case where it was expected that a vessel would move forward, and where it was thought by the court such vessel was under obligation to do so, but the authority is cited to show that under particular conditions and emergencies there is greater danger in the want of motion than in moving. The Atlanta was more dangerous anchored as- she was than she would have been if moving, because with steam on and in motion she could have done her part in keeping out of the road if ascending in an improper part of the river.
On account of the irregular, or what the witnesses call the zigzag, position of the fleet the difficulties and dangers of entering the harbor were aggravated. This irregular line occupied *273 by the fleet caused the ships to present an extensive front. If they had been moored in customary places no blame could attach to the ships’ officers, because such situations were those where vessels were expected to be. Approaching boats are always supposed to be on their guard against the known places of anchorage for shipping, but the case before us discloses locations by the men-of-war too far away from the New Orleans shore to admit of boats trying to go there to calculate upon passing to their right upon entering the harbor from above, and yet too close to the city side of the river to make the attempt to go between absolutely safe.
If to take an unlawful position means anything, if to get in the way dnd unreasonably stop carries any consequence, or if disregard of statutory requirement has application where damage ensues to others, then this case must be ranged with those where vessels are guilty of culpable negligence in anchoringin the common passages of great thoroughfares. The ships were at the entrance and in the immediate harbor and. in the way of others. All classes and sizes of water craft have the right to follow usual channels. (Sherlock v. Bainbridge, 41 Ind., 35; Wood’s Cir. Ct. Rep., 16.) None possess the right to block these channels.
Necessity alone excuses vessels which are moored and lie in the channel or entrance to a port. (The Scioto, 2 Ware, 360; Martin v. Five Canal Boats, 24 Fed. Rep., 500; The Margaret J. Sanford, 30 Fed. Rep., 714; 63 Fed. Rep., 1020.)
The number of the ships increased the chances for collision with those unaware of their presence at places never before taken, and their size and weight made them more hazardous to those navigating in their midst. If securely anchored, they were planted like great rocks in the river without necessity; if by single chains, the dangers were greater with less necessity.
For this, who was responsible?
At the time of the collision there existed at the port a board of five harbor masters, duly appointed and acting according to law. Among the duties they were charged to perform by the laws of the State of Louisiana, the duty of regulating and stationing all vessels in the stream within the limits of the port and at the levees thereof was imposed. Any master or other person opposing or resisting this board in the execution of the duties imposed upon them by law was subject to fine,
*274 The Mississippi River at New Orleans is entirely within the confines of the State of Louisiana. The jurisdiction of the board of harbor masters over the waterfront extends along the 'Algiers shore. (Pickles v. Dry Dock Co., 38 La. Annual, 412.)
The chairman of the board of harbor masters, who was introduced as a witness for the Government, disclaims, or attempts to disclaim, on behalf of the board, any control over vessels of the Navy, on the ground that such vessels pay no duties, and have the right to come and go as they idease. Ships of the Navy have the right in time of war or peace to go anywhere in navigable waters pursuant to Government orders. But in time of peace they are as much subject to the reasonable rules and regulations adopted for the safety of all the shipping using a harbor consistent with their own safety and duty to the Government as others. The board of harbor masters at the port of New Orleans had the power and authority to prescribe where vessels might lie in the harbor. An ordinance of this kind embodying other similar regulations is not in conflict with any law of Congress regulating commerce, and is therefore valid. (Owners of Brig James Gray v. Owners of Ship John Fraser et al., 21 How., 184.) The chairman of the board of harbor masters at New Orleans was consulted about the matter of location by the commanding officer of the fleet, and this chairman undertook to direct the location. The colloquy between the chairman of this board and the naval commander, which resulted in the location of the ships, can not be regarded as mere advice on the part of the chairman. But whether regarded as advice or a positive direction, the ships were not located where their commander was told they should- go. When complaint was made to the local authorities, on the occasion of the first visit of the squadron, that the ships were in the way, the naval commander applied to the chairman of the board to designate a safe anchorage ground for the fleet to occupy on their next visit to New Orleans, and the chairman directed the naval commander to lay over as well as possible to the Algiers shore. This direction was given with special reference to the return of the vessels, and just before the ships were ready to depart after the first visit. At the time of this complaint the ships were located in the neighborhood of Canal street, in places no more objectionable than the places taken when they returned. Indeed, for vessels descending the river and trying to effect an entrance to the harbor, the place where the collision occurred was more dangerous to navigation than those taken on the *275 occasion of tbe first visit. About four weeks intervened between the cbairman’s giving directions and the debt’s return to New Orleans. Though the chairman had given directions, he exercised no personal supervision of the actual anchorage of the fleet. The commanding officer undoubtedly desired to anchor in a place where his fleet would cause no inconvenience to merchant vessels, but it seems to the court certain that the fleet did not anchor according to the directions.
But was the tow free from fault?- And what, if any, is the degree of this fault?
There are authorities which hold that, under given circumstances, it is the duty of tows coming to a part of the river in which there are obstructions to navigation to lie by and divide up the tow before attempting to land. In the case of The Syracuse (12 Wall., 167) it was held that a steamer having a very large tow and approaching a place where, from the number of vessels in the water and the force of the countercurrent, navigation with such a tow is apt to be dangerous, but with a small one less so — a place, for example, like that near the Battery, New York, where the East River and the Hudson meet— is bound to proceed with great care, and if within 2 or 3 miles of the place, though not nearer, she can divide her tow, she is bound to divide it. The Syracuse had a tow of 40 boats. Within a mile or so of the Battery that part of the harbor was seen to be full of vessels; to the view of the captain there seemed to be but one passage through which the tow could be taken; the tide was ebb, setting south in the North Kiver but above Governor’s Island setting sharply to the west and southwest as it came out of the East River, so that the tow coming down the North River had the tide with her, but as she turned into the East River had to meet an ebb tide coming from the east nearly at right angles, while many vessels were lying at anchor all around. Of necessity the rear end of a long tow would be swept well around. The boat that was injured was at the rear end of the tow and a part of it. In deciding £he case the court (after commenting on the omission of the master of the tow to stop above, as he had been doing at night with previous tows, and that it was easy to tell at the distance of a mile that the river at the Battery was full of vessels and at ebb tide dangerous to navigate through with such a fleet) said the master, under these circumstances, should have remained at the point of observation until the tide had slacked, or have divided the tow.
*276 In the case of The Mohler (23 Wall., 230) the weather was boisterous and the boat laid up on account of the wind. The weather had not cleared nor the direction of the wind changed when the boat resumed her journey. Being forewarned, the court held that the master should not have undertaken the passage of the river between two piers where, on account of the high and uncertain wind, there was danger of collision with one of the piers, It was consequently declared to be the duty of the master to lie by until the wind had gone down.
In the case of Nicholson v. The Adams (28 Fed. Rep., 889) it was held to be negligence for a tug to tow a large and deeply laden schooner up a narrow channel during the prevalence of a hard storm, with its' sails unfurled and in such a condition as to cause the vessel to become unmanageable, whereby a collision occurred.
These cases speak for themselves. The facts in them differ materially from the circumstances shown to exist here. They mean in their last analysis that in the face of danger and with full knowledge of its existence masters of towboats shall not needlessly take risks that might well be avoided by timely precautions, and in no event must do so against the requirement of any law or the rules generally adopted for the safe landing of tows.
We can well understand the necessity for the division of tows and the consequent duty of masters to break them up and carry them to particular places in sections, where, from the number and size of the barges, navigation is rendered less difficult and dangerous than if held together and propelled as one. We know of no rule on the subject save that which good seamanship and a proper regard for the rights of others and their own safety would suggest. Where channels are very narrow it is quite common for steamers with barges to stop and take them through, one or two or more at a time according to the emergencies of the time and place. But with an.open river and a proper current they are generally kept together, according to'the ability of the towboat to handle the barges in safety. The larger the tow the greater the difficulty of handling them, of course, but eight barges make a medium-sized tow; and steamers like the Future City could safely handle fifteen loaded barges of 1,000 feet in length. Those carried by the Future City were all stanch, sound, and seaworthy, fully and adequately manned, officered, and equipped, *277 and the steamer wanting in nothing to perform its work.. Other towboats possessing less power were in the habit of conveying larger tows down the river and landing them at New Orleans, without division, over the precise course adopted by the plaintiff. Unless towboats were propelling large barges laden with coal, where thirty or forty constituted the tow, it was not difficult to avoid collision in attempting to land. The arrangement of the barges about the steamer is shown by the following diagram:

The tow thus made up was about 607 feet in length and about 175 feet in breadth.
It was not customary to divide tows in landing them at New Orleans. They were carried in safety to the port as one. If we should declare, then, that tows should be divided, what sort of a division must it be? Into how many parts must one tow be separated? And shall the courts decide for river men and pilots what the laws and the rules of navigation have omitted to do in this respect? If experience had proved the safety of the course adopted in this instance, and usage had sanctioned it as free from danger to passing vessels or those anchored at their usual places in the harbor, then the question as to whether the tow should have been stopped at a,reasonably safe distance before commencing to land and broken up must depend upon the ability of the towboat to handle her barges against expected dangers in safety to the place of landing under such circumstances as wind and tide and other causes may create at the time.
Was it incumbent on the tow to first sight the harbor before making preparations to land in the accustomed manner? If so, the right of tows to land at New Orleans at the places they have a right to go without being first divided must be denied, inasmuch as the current that is shown to set in to the Algiers shore at the place where the harbor comes in full view to those descending the river would carry tows into the bank on the side opposite the landing or far down the river. None in *278 charge of a tow have the right to take chances between two courses — the one of safety and the other involving' possible collision — by abandoning the safe for the more hazardous course. But every preparation to land in the usual way had been made, and the elevator had been passed as the Future City was attempting to place her barges at the proper place on the river below. Then the squall struck, lasting some five minutes. The tow was drifting slowly at the time with the watch on the front barge, the pilots at their posts, and the gauge in the engineer’s room showing all the steam allowed by law. The rain had ceased just before the men of-war were discovered, and the tow was under as much control as it could be at that point and in the quartering position made necessary by the usual methods adopted for landing.
To obvíate a drift too far out in the current there is a necessity to resort to what is known as the flanking movement at that place. By backing toward the shore and keeping close enough to it, tows are prevented from drifting across the river. Just before reaching a landing the tow is straightened up and carried in.
In rounding points, towboats adopt one of two courses— “ steering out” or “flanking.” Steering out consists in the towboat backing her stern close inshore, thus throwing her head out into the stream, and then driving ahead at full speed around the bend. Flanking consists in placing the tow broadside nearly at right angles to the current of the river, the bow extending out into the river and quartering slightly downstream, the stern of the propeller being as close to the shore as safety will admit. In this manner tows are floated down, the steamer backing at intervals as the forces of the current carry the tows out. There is no driving except to get headway to flank on and to keep the stern of the steamer from the shipping by the shore.
Driving under such circumstances is very slight. As the landing is neared the steamer commences to back strong until it comes in a perpendicular shape to the New Orleans shore and parallel with it and then lands. Flanking was the course pursued by the plaintiff’s tow on this occasion.
The flanking operation is customary and proper and, in fact, the only feasible course in entering the harbor. Instead of driving ahead at full speed around the bend, precipitating the tow against passing vessels, the Future City backed in as *279 occasion required, keeping far enough away from tbe shipping by the shore to avoid collision, but keeping up steam to control the load in front.
But was the Future City on the wrong side of the river? If so, she navigated wrongfully for mere purposes of her own convenience. In this event the encounter of the danger was needless, inasmuch as the convenieuce of the one vessel must be subordinated to the safety of others.
If, in conforming to custom, the tow began preparations to land 2 miles or more above, ascending steamers knew of the the custom and (equally with the pilots of descending craft) were on the lookout to avoid danger. It is reasonably certain that watchfulness would be exercised by both ascending and descending boats under such circumstances, and especially by the descending craft, as safety was quickly assured without inconvenience by the descending steamer pushing her tow farther out in the river and clearing the fairway for an ascending vessel hugging the shore. This is what the defendants allege the Future City did do to avoid a steamer shown to have been passing. Though cleared in safety, it is argued that the Future City went so far in the stream she was caught in the current that sets in. just about the point of divergence from her course and carried toward the middle of the river. The findings do not sustain the argument. Even if they did, the tow was doing the proper thing to keep out of the way of the coming steamer. It was necessary to go out in the river some to get around the point.
The passing steamer was known as the Mabel Comeaux. In approaching, the steamer blew one blast of her whistle, thus indicating to the Future City her intention to keep to the starboard or city shore, and that the latter was to keep out of the way. It is argued that if the tow had the right of way the Future City could have kept her course, but failing therein, the collision around the point was the result. The failure of the tow to force the ascending steamer to its right was lawful and proper. When the pilots saw each other they were above Celeste street. When the Comeaux came in sight of the tow the latter was far enough away from the shore for ascending boats to pass safely between, and substantially there was no change in the course of the tow.
The contention that the tow erred in going too far toward the middle of the stream in order to avoid the Mabel Comeaux *280 is in conflict witli the theory of the defense, that the middle of the river was the place for the tow to descend. We take this argument, however, to mean that the Future City, having-abandoned its right to descend in the middle of the stream and having put herself in the bend where her pilots were unable to see, she should have remained on that side and kept the tow close to the shore, thus forcing an ascending vessel to go to its right in the stream. But if the Future City was at fault in leaving the middle of the river in trying to land, then the navigation of tows in rounding points everywhere is dangerous and improper, and the practice adopted by pilots essentially wrong.
Before we condemn this practice and establish a new rule for the government of pilots in landing tows we will consider the propriety or impropriety of doing so from the circumstances appearing in this case.
If the line of the current had been followed the tow.would have come down the stream to a point somewhere opposite Celeste street. That kind of navigation would have been improper, in that the force of the current upon a steamer and eight loaded barges so far from shore at that point would have operated to prevent the tow from being backed up in time to laud. If obliged to go to the right of vessels anchored about the middle of the stream in the direction of Algiers the towboat would have been carried down far beyond the landing. Thus-, the tow would have been denied the right to land if under obligation to descend the middle of the river until the harbor was seen except by going down and breaking up to be brought back through the crowded harbor one at a time. But loaded barges are not expected to ascend rivers. By descending the middle of the river until in sight of her landing the advantage of keeping out of the way of unlawfully anchored vessels would have been secured, but the privilege of landing necessarily abandoned.
It is good, seamanship to know how to make a landing and take advantage of all the slack water for that purpose. To run for easy places, back in, and reach landings on one side or the other is better seamanship than to deal with adverse currents. With the set-in to the other side of the river from Celeste street loaded barges carried to the middle of such a current would be dangerous because of the tendency to go into the bank or becoming unmanageable in the presence of boats crossing the river.
*281 Ferryboats lie iu tlie current same as tows floating down. The bead of each ferryboat is not upstream nor are they stationary, except as they arrive and depart from their places of landing. Both tow and ferryboat being in motion and floating with the current, collisions do not occur.
Had the tow kept near the shore on the opposite side of the river and continued to a point below Celeste street, the landing on the New Orleans side could have been reached only by crossing the stream. Apparently there would have been much more danger to shipping in the harbor in this procedure than in the course pursued, as barges can not be carried to land like a steamer free from such incumbrances. The space occupied by a tow in crossing the river would have imposed greater danger where vessels were most numerous.
In landing tows steamers propelling them must, of course, turn in somewhere to the bank. If there is reason to believe that danger is ahead sufficient to render escape from collision difficult, measures must be taken to avoid it. Without such knowledge or some reasonable ground to justify the belief that danger is about to be encountered, the descending vessel has the right to obey custom and those rules observed in navigation and sanctioned by usage as safe.
The danger to the tow iu this case was an unanticipated peril. The expected source of danger was the shipping in the harbor alongside the landings and places where they were accustomed to be moored, and in outgoing vessels.
The rules of navigation invoked to sustain the alleged fault of being on the wrong side of the river are those applying' to the right of way on Western rivers, and it is claimed that under these rules where a descending boat navigates close in to the shore at the risk of collision with upgoiug boats, the steamer descending violates the custom and is blamable for any collision.
Inspectors’ Bule I, referring to right of way on most Western rivers (Spencer Mar. Coll., sec. 141), and the custom prevailing for the navigation of these rivers under inspectors’ Bule Y (ibid., sec. 145), and the case of Goslee v. Shute (18 How., 463) cover cases of ascending and descending steamers and the consequences of deviating from a custom established by usage. Their application to a descending boat in the case of others not ascending but stationed at improper places is not apparent, but will be considered.
*282 It lias been held under Hule I that as between steamboats and flatboats the right of way is with the latter and the steamer is obliged to avoid them. (The Marshall, 12 Fed. Rep., 921; Spencer Mar. Coll., 288.)
- In the navigation of the Mississippi River, it is the custom of ascending steam vessels to navigate near the points, and descending steamers, if without tow's, to run the bends — that is, the ascending steamers hug the starboard shore, while the descending steamers navigate to the right of those ascending the river. The navigation of tows varies. They are sometimes run across from point to point and then run around the point; but sometimes in turning a point down they are held in the same course and do not cross at all. The course is governed generally by the difference in the river at different places. No fixed rule for the navigation of tows exists for every part of the river. No doubt it is customary for them to recognize the course of an ascending boat to hug the starboard shore (going up) and to keep out of their way. In landing and leaving the harbor there is a customary course at the port of New Orleans. Outgoing vessels run close in to the shipping in ascending; incoming downward steamers and tows find their usual course to the point where it becomes necessary to back in to reach their landings below. There is a clear and well-defined custom at New Orleans respecting the course and practice of tows to land. Descending tows come close in to the shore on the city side of the river. If they did not pursue this course descending tows would come down in the current so far out the motive power could not back the tow to land. One of the reasons for coming in close to the shore is to catch the slack water near vessels anchored to the shore. This is so as to all landings, and in trying to reach any stopping place in any harbor, it is either one side or the other that boats must necessarily pursue.
It is insisted that the custom was improper, negligent, and dangerous,, because of the space occupied by any tow in trying to land.
In approaching a harbor it is the duty of steam vessels to approach with care and a moderate rate of speed. Barges and the steamer towing them, like vessels in charge of a tug, are in contemplation of law but one vessel and that under steam. With no higher rights than steamers, yet in their actual navigation tows are much the same as sailing vessels. *283 There are differences between the movement of steamers with tows and those without them. Steamers land with more ease and dispatch and in less sea room than towboats, and in entering a harbor the currents tell more powerfully against a tow to prevent an easy landing unless the preparations for reaching land are taken in advance of the time necessary to begin preparations to go to the shore by a steamer unattended with barges. On account of their size and bulk there is greater reason for care and moderate speed in handling tows, but beyond this no greater burden is imposed upon their navigation than other craft.
It is not negligence to navigate a harbor with a large tow, much less a medium-sized one, if the tow be manageable. The navigation of a harbor at night or in a thick fog is not of itself negligence (The Sylph, 4 Blatch., 24; Ward v. The Rossiter, 6 McLean, 63; Ward v. The Donsman, 6 McLean, 231; The Scioto, 2 Ware, 360; The Wesley A. Gore, 27 Fed. Rep., 311; Spen. Mar. Col., sec. 157), the only burden imposed by navigation generally at night or in a fog being the added care to avoid danger, and this rule would include the navigation of tows.
Tows form an important part of the commerce of our Western waters. The flatboat preceded the use of the steamboat on the Mississippi, and bids fair to supersede the use of steam vessels, except for purposes limited to the handling of tows and the trade of the river at points not reached by railroads or places where discriminating rates are supposed to prevail.
The traffic which coal boats from the Ohio and grain boats from the Missouri make on the Mississippi River is large, and, although unwieldy as compared with steamers, tows pursue their course in comparative safety if experience be any guide. They move slower than steamers, take courses that the latter do not, run the bends where descending steamers keep in the middle of the river, and frequently resont to the one course they can take where steam vessels can make a choice between channels.
Speaking of the right of vessels to vary their courses, the Supreme Court, in the case of The John L. Hasbrouck (93 U. S. R., 407), said: “Vessels of all kinds, whether propelled by steam'or sails, are allowed and expected to vary their respective courses to correspond with the well-known sinuosities of the navigable portions of the river, and to avoid the dangers of navigation arising from locks, shoals, and sandbars, as well *284 as from curves and bends iri the banks of the river or the channel of navigation.” Thus, when a change of course is reasonably necessary to prevent a sailing vessel from running into the bank or encountering any other natural obstruction to the navigation, such change is obviously permissible, necessary changes not being violations of the sailing rule. Eules of navigation vary according to the exigencies of business and the wants of the public. (The Favorita, 23 Wall., 598.)
Carried to its full extent, the argument for the defendants would place the tow in the middle of the river in all cases where there were bends because of danger from ascending vessels, or of stopping at every bend to see if there was anything in the way below. It has been shown that the plaintiff’s tow had no reason to anticipate that the operation of the current or the force of the wind or the weight of the tow would have any bearing upon her duty with reference to anything situated as the war vessels, because her managers had a right to expect that the channel at that distance would be clear from steamers leaving the wharf or from vessels brought to anchor at the wharf or in proper places near the shore. Her master had a right to expect that the coast would be clear at that point from steamers coming out from the wharf. The timely measures of precaution required to be taken in all cases relate to evident or reasonably expected dangers, without imposing the obligation in the case of tows to abandon the customary methods of flanking around points reasonably supposed to be free from obstruction.
The authorities to which we are referred establish fault in particular cases under circumstances widely different from those in the case at bar.
The case of The Alicia Washburn(19 Fed. R., 788) was where a steam tug with her tow was going around a dangerous bend where the tide set strongly across the river and a schooner rounding such a bend in the opposite direction was becalmed. It was held that the steam tug was not entitled, as a matter of right, to occupy the full half of the river on the right-hand side; and that tows overtaking each other in that vicinity, unless sailing to the extreme right of the river, should forbear attempting to pass each other until they had gone beyond the points of danger.
In the case of The Uncle Abe (18 Fed. R., 270), there was a positive nonobservance of the rules- of navigation and a vio *285 lation of tbe State statute forbidding steamers to approach or to pass boats ahead of them within 60 feet. This was a case where the tow had come around the Battery in the harbor of New York and was proceeding up the East River, and on approaching another tow from Albany, known as the Walt Clark, undertook to pass between it and the tugboat Christian, which was 200 or 300 feet astern and a little outside of the Clark. By the inspector’s rules the Uncle Abe was bound to go astern of the Christian, and by rule 19 she was bound to keep out of the Avay of anything on her own starboard hand instead of keeping near the New York shore and attempting to cross the bows of the other tug between the latter and the other tow. The speed was not checked, and the State law forbidding-steamers to approach or to pass boats ahead of them within 60 feet, the Uncle Abe was held liable.
In Goslee v. Slvute, (supra) the collision was chiefly owing to the neglect of the ascending boat to keep near the right bank and the descending one to keep near the middle of the river. The descending boat had left a landing and resumed her journey, and the ascending steamer had left the way established by usage. The descending vessel being in her proper place, and the ascending vessel being in an improper course, the latter was held liable. Both were steamers unattended with tows. If the ascending boat had continued near the right bank of the river there would have been no collision. The case at bar more nearly resembles one where it was held that barges anchored in a place of manifest danger in the way of tows coming out on the rise of water with pilots ignorant of the anchorage, blame was put on the barges at anchor. (Fawcett v. Morgan, 6 Fed. Rep., 200.)
If usage can make lawful and proper the navigation of a river, so that both ascending and descending vessel shall keep to the right of the center of the channel, as oh the Hudson River (The Vanderbilt, 6 Wall., 225), no valid reason can be assigned against the custom of a tow entering the harbor at New Orleans to follow the rule adopted there of going in on the city side of the river to barge landings, even though up-going steamers ascend on the same side, each craft being supposed to know how to avoid direct meeting. Every deviation from custom is at the risk of those not following it.
Independent of usage the Future City was not in fault, because the course adopted was safest if the object was to
*286 land. If the intention was to go on without landing, the right to round the point in safety was included in the privilege of varying the course for that purpose.
The last question respecting contributory negligence is the conduct and management of the tow after rounding the point from where the ships were first seen. Upon discovering the danger did the master and pilots exercise the proper degree of skill? Was everything done that could reasonably be expected to be done to avoid the collision?
Persons in certain emergencies and called upon to act upon peculiar circumstances are not held to the exercise of the same degree.of caution as in other cases (Thurber v. Harlem Bridge Co., 60 N. Y., 326; The City of New York, 35 Fed. R., 604; Union Pacific Railway Co. v. McDonald, 152 U. S., 281); and whether a vessel threatened with collision without her fault adopts the best course is unimportant if she adopts the one she thinks best. (The Brown and the Hamilton Fish, 35 Fed. R., 60; The Fxcelsior, 38 Fed. R., 271; The City of New York, 147 U. S., 72.) Regard must always be had to the exigenciés of the injured party’s position and to all the circumstances of the xiarticular occasion [Kane v. Northern'Central Railway Co., 128 U. S., 95); and where human life and personal safety are involved, and the issue is one of negligence, the law will not lightly impute negligence to an effort, made in good faith, to preserve the oue or to secure the other, unless the circumstances under which that effort was made show recklessness or rashness (U. P. R. R. Co. v. McDonald, sufra). And where one vessel is brought into immediate jeopardy by another’s fault, such vessel is not liable because she has not been managed with perfect skill and presence of mind. {The Maggie Smith, 123 U. S., 349; The Blue Jacket, 144 U. S., 391, and authorities cited.)
Change of course on the water in an emergency does not render the vessel so changing her course liable for resulting collision. {The Schmidt v. The Reading, 43 Fed. R., 815; The Agnes Manning, 44 Fed. R., 110.)u The charge of negligence here, however, is the 'failure of the tow when confronted with the men-of-war to get out of her course and abandon the attempt to reach the lauding, and, instead of seeking to go between the ships and the city side of the river, to have made an effort to clear the anchored vessels by going to the side of the river opposite the landing. The collision may possibly *287 have been averted, it is true, if, when the ship was sighted, the tow had made for the Algiers shore. But it is not probable, in view of the short distance between the tow and the ships after their discovery, and in view of the strength of the current there, that the collision could have been averted. It is more probable that any attempt to cross the river above the men of-war at that time and place would have resulted in a collision even more disastrous than that which actually took place. For an act resolved upon in extremis under such circumstances the plaintiff can not be held responsible. (The Sarah Thorp, 44 Fed. R., 637; The Nichols, 7 Wall., 666.)
If the ships were in exposed and dangerous places, their officers are not in position to assert that the tow should have been propelled across the bow of the forward ship, even though the wrong means appeared to have been chosen by the tow to get out of the way. In such cases the law will not hold the pilot of the tow guilty of fault unless his seamanship was clearly unskillful. {The Favorita, 18 Wall., 603.)
The tow was advancing at a slow rate of speed, and at a rate not as great as the current. This speed was not over 5 miles an hour. The Future City had, but a short distance above the point and before commencing to round it, signaled its approach to an ascending boat. Signals are to be used when the circumstances make them necessary, and while the warning was not what the meu-of-war could claim as a matter of right, lying at unexpected places and unseen by the watch or pilots of the tow, no response was made. Signals from the Future City availed nothing anyway, as the ships were lying dead in the water and could do nothing to relieve the situation. The helplessness created by the ships’ officers can not excuse the injury done to others at the time and place. Immediately upon discovering the ships the master of the tow directed the pilot to go ahead so as to pass to the right, in order to avoid tearing the wheel at the stern by the shipping along the shore. The pilot replied that by going ahead the whole tow would be wrecked, and acting on his judgment, the tow was backed, but without avail. The ships were discovered too late. The Future City backed the tow under full head of steam, working full stroke, with all the steamer’s power, to check the headway and straighten the tow. The object was to bring the tow broadside to the shore, so as to pass between the Atlanta and the lauding side of the river. It is not disputed that (in the *288 language of the river) the Future City was “gouged” and every effort made to straighten the barges, which, if completely successful, would have entirely averted the disaster. The headway of the steamer had only been lost to the extent which the quartering position taken to get to the shore made necessary. The tow was in as much control of its motive power at the time of the discovery of the vessels as any tow could well be engaged in an attempt to land at such time and place. Fault can not be inferred from the methods used to' descend as in the case of an ascending steamer approaching a landing in the face of a high wind and sensible enough of danger not to attempt to fasten to another steamer already lying at the wharf, but where blame was attached for backing on a flatboat in ground designated for flatboats in trying to land above the flatboat. Such a case was Culbertson v. Shaw (18 How., 585, cited by the defense), where the river was open and a safe landing might have been made if the steamer had turned instead of voluntarily losing its headway by the order to back down to the flatboat. In this case the river was not open and the discovery of the ships found the tow at an angle with a landing impossible if the Future City had not kept backing with the danger of collision greater if the attempt had been made to cross the bow of the improperly anchored ship below.
The distance between the tow and the ships when the latter were discovered by the tow on rounding the’point’opposite Celeste street was the distance from that point to the place where the Atlanta lay opposite Bace street. In that distance the tow could not check its headway or change its course. In the effort to keep out of the way the Future City came within a short distance of the shipping moored by the river bank next to the city, and everything possible was done to avoid the collision. The findings on this point are sustained by all the evidence, including an official report. The lead barge, on the port side, struck the ram of the Atlanta broadside on; the tow went on with the current toward the Galena., lying some 400 feet astern of the Atlanta and closer to the New Orleans shore than the latter. As the Future City reached a point opposite to her, the Galena, which was swinging in and out in a single chain, sheered in and struck the lead barge on the starboard side and sunk it, and also cut the fastenings of the tow. This resulted in an unloosed barge being carried by the current into collision with the Kichmond still nearer the landing.
*289 The accident was not the result of natural causes, occasioned by the forces of wind and current. In cases where the loss is occasioned by a storm or other vis major each party must bear bis own loss, upon the principle that no one is responsible for loss produced by causes over which human agency could exercise no control. In the case of The Grace Girdler (7 Wall., 196), inevitable accident was declared to be where a vessel is pursuing a lawful vocation in a lawful manner, using the proper precautions against dangers, and an accident occurs. Where collision occurs exclusively from natural causes and without any negligence or fault either on the part of the owner of the respective vessels or of those intrusted with their control and management, the rule applies, but if fault or negligence be shown to have been committed by one or the other the rule can have no application. (Union Steamship Co. v. New York and Virginia Steamship Co., 24 How., 307; Sampson et al. v. United States, 12 C., Cls. R.., 480; The Olarita and the Clara, 23 Wall., 1.) When the respective vessels are seen by the other and disasters occur it is correct to say that inevitable accident, as applied to such a case, must be understood to mean a collision which occurs when both parties have endeavored by every means in their power, with due care and caution and a proper display of nautical skill, to prevent the occurrence of the accident. (The Morning Light, 2 Wall., 560; The Pennsylvania, 24 How., 330.) ■ Tested by these rules the defense of inevitable accident fails in the case before us. No natural causes operated to render the navigation of the river unsafe for the towboat to enter the harbor. The river currents were not such as to interfere with the methods adopted by the towboat to land its barges in the places they were entitled to go. The wind and rain had no appreciable effect upon the movements of the tow. Whatever blow there was at the time was encountered after the attempt to land had been begun and was not of sufficient violence to interfere with the course the tow would have pursued independent of the wind and rain, which had subsided by the time the vessels were discovered. The weather did not delay the discovery of the ships, concealed as they were by the permanent obstructions on the shore and by vessels moored along the river banks. Due care and caution, with a reasonably proper display of nautical skill, was shown on the part of the plaintiff’s agents. It should not be made to suffer for the fault of others. These officers located their ships *290 in that part of the river which tows were in the habit of using to mate their landings. They took no notice of the rights of others, or misunderstood the chairman of the board of harbor masters. In either event the consequences of their negligence are the same.
The opinion of the court is that the plaintiff is entitled to recover the value of the property destroyed and amounts necessarily expended in repairs to the towboats not destroyed but damaged by the collision and the amount of freight earnings lost by it. The total damage proved to the satisfaction of the court amounts to $19,808.85, for which judgment will be entered.