### THE ETRURIA.

### THE LEONARD J. BUSBY.

#### (District Court, S. D. New York. June 26, 1905.)

1. COLLISION—STEAMSHIP AND DRIFTING BARGE—NEGLIGENCE OF TUG.

A towing tug, which cast two barges, having neither motive power nor means of signaling, adrift near the middle of the Hudson river opposite New York City, in a fog or thick atmosphere, while delivering a third boat, *held* solely in fault for a collision between one of such barges and a steamship passing out to sea, which did not make out the barges until too late to avoid the collision.

2. TOWAGE—LEAVING TOWS ADRIFT—CUSTOM.

The practice on the part of towing vessels of casting part of their tows adrift in and in the vicinity of New York Harbor, and leaving them while attending to other tows, cannot be justified by custom, even if such custom could be shown.

In Admiralty. Suit for Collision.

Albert A. Wray, for the Wright & Cobb Lighterage Company and Leonard J. Busby.

Lord, Day & Lord and Wilhelmus Mynderse, for the Etruria.

ADAMS, District Judge. This action was brought by The Wright & Cobb Lighterage Company, the owner of the barge Oval Brand, to recover the damages sustained through a collision between the barge and the steamship Etruria, in the Hudson River about in the middle of the river and opposite Pier 25, on the 6th day of February, 1904. The claimant of the Etruria brought in the Leonard J. Busby, owned by the libellant, by petition.

The Busby took three barges in tow alongside in the East River for delivery at points in the Hudson River. One of them was destined for Pier 25 and when that vicinity was reached, the Busby en-

deavored to shove the tow in towards it through an accumulation of ice, but, being a low pressure boat, found it impracticable, and left two of the barges in the river while she took the third, the Hoboken, astern on a hawser, and managed to get her to her destination, leaving the others, the Masters and the Oval Brand, in the river in the outermost part of the ice, and about in the centre of the river. In delivering the Hoboken, the Busby was detained longer than she expected to be. The tide was the beginning of the flood but very little current running. There was no wind to affect the vessels.

The Etruria was lying, headed in, on the south side of Pier 51. She backed out at 9:06 o'clock A. M., and turned, with the aid of two tugs, down the river, bound to sea. As she was proceeding, she passed a railroad float about opposite Jay Street backing out from the New York shore, which required the Etruria to go more to the starboard. Before she had regained her course, the loom of the two barges was sighted slightly on the steamship's port bow, 1,200 to 1,500 feet away, and reported by the Etruria's lookouts and seen by the steamship's officers stationed on the bridge.

There is some dispute as to the condition of the weather, the libellant contending that although it was hazy, large objects could be distinctly seen for a distance of a mile or more. The claimant contends that it was foggy enough for all vessels to sound fog signals. The Government weather observer testified that the Manhattan shore was obscured from the Weather Bureau station at No. 100 Broadway, some 300 feet high, until 9:30 o'clock A. M., and the New Jersey shore until 10 A. M. From such a height and distance away, no absolutely accurate observations could be made of the fog conditions on the water, nor how far it was possible for persons there to see. It appears by the testimony that observations were possible for about 1500 feet but though objects could, in a general way, be seen that distance, it was not possible to discern with certainty what was taking place on or near the objects. It was not densely foggy, but it was an occasion on which fog signals should have been given. The Etruria was proceeding slowly at the rate of three or four knots and sounded such signals, as were other steamers navigating in the river that morning.

The barges were lying headed up and across the river towards the Manhattan shore and the collision occurred by the Etruria striking, with her stem, the after part of the Oval Brand on the port side, doing considerable damage.

The libellant urges that the fault of the collision lies with the Etruria principally because she did not have vigilant lookouts to report the presence of the barges, which were plainly to be seen a considerable distance away. She did in fact have two men stationed on the lookout bridge engaged in the performance of that duty. They have not been called as witnesses, but it appears that the men were discharged in the usual way at the end of the voyage before it was known that this claim would be made. It is shown

satisfactorily enough that the lookouts were duly stationed on the lookout bridge but their testimony is so important in a case of this kind that it should clearly appear no efforts have been spared to obtain the testimony of the witnesses. It is testified that the witnesses have disappeared from the claimant's knowledge, but not very strongly that all proper efforts have been made to find and produce them. I think it was incumbent on the steamship to keep track of the witnesses, if possible, so their testimony could be taken, but, notwithstanding such impression, I feel constrained to exonerate the steamship because of the pronounced fault of the Busby in leaving the barges drifting subject to all the contingencies of a crowded river in a fog or a thick atmosphere. It is sought by the libellant to overcome this obvious fault by alleging, and producing proof to establish, that such a method of navigation is supported by custom in New York Harbor. The testimony would indicate that vessels here do occasionally pursue such a course and some witnesses say it is customary. It does not seem to me that it has been or could be proved to be so but even if it were, it should not receive the sanction of the court. Such practice has been condemned by the Department of Commerce and Labor in a circular of which the following is a copy:

"Department of Commerce and Labor
Steamboat-Inspection Service.

Circular                            Office of Local Inspectors
Letter.                            New York, N. Y., June 2, 1904.

To Masters, Owners and Agents of Towing Steamers, Port of New York.
Gentlemen:

Your attention is called to the following circular letter addressed to this office, which explains itself. You will please call especial attention thereto of the masters and pilots of your steamers.

Respectfully,

_____

U. S. Local Inspectors.

Circular Letter.                   Office of Supervising Inspector,
2nd District,
New York, N. Y. May 31, 1904.

U. S. Local Inspectors,
      Second District.

Gentlemen:

Referring to the practice which obtains among some masters of towing steamers and steam-lighters of occasionally casting adrift part of their tows and for a time leaving the vessel or vessels so cast adrift as a menace to navigation, this office has been advised that such procedure will not be sanctioned by The Honorable, The Secretary of Commerce and Labor or the Supervising Inspector-General, and that it should be condemned and discontinued.

You will please make an earnest endeavor to stop this practice wherever it exists in your district, and will advise masters of tugs and steam lighters under your jurisdiction that they must expect to face serious consequences if they continue it.             Respectfully,

Robert S. Rodie,
Supervising Inspector, 2nd Dist."

Apart from the Department instructions, even if the barges had been anchored where they were struck, and given proper signals, they would nevertheless have been guilty of fault. Navigating vessels would not naturally expect to find vessels anchored so far from the legally designated places and when, exercising due diligence, they collide with vessels so anchored, the improperly anchored vessel will be found guilty of the fault producing the collision. The St. Louis and Mississippi Valley Trans. Co. v. The United States, 33 Ct. Cl. 251; Id., 184 U. S. 247, 22 Sup. Ct. 350, 46 L. Ed. 520. Not being anchored it was all the more incumbent upon them to give adequate warning signals of their presence. Such signals would doubtless have averted the collision. Even if they had escaped the attention of the lookouts, there were several others on the steamship who were alert to discover what was in the steamship's way. The chief officer was stationed on the forecastle head, forward of the lookout bridge. He says the weather at the time was foggy and the barges were reported by the lookout man to the bridge as soon as they came in sight. The testimony of those who were on the navigating bridge shows that they received the reports and almost immediately reversed the steamship's engines but it was too late to avoid the collision. It appears that when the barges were made out to be drifting vessels, the Etruria was about 500 feet away from them. It was then probably too late to stop her in time to avoid the collision.

The libel against the Etruria is dismissed. No recovery is sought by the libellant against the Busby.