## THE "JOHN L. HASBROUCK."

1. The rule requiring a sailing-vessel to keep her course when approaching a steamer in such direction as to involve risk of collision does not forbid such necessary variations in her course as will enable her to avoid immediate danger arising from natural obstructions to navigation.
2. Where well-known usage has sanctioned one course for a steamer ascending, and another for a sailing-vessel descending, a river, the vessel, if required by natural obstructions to navigation to change her course, is, after passing them, bound to resume it. Failing to do so, and continuing her course directly into that which an approaching steamer is properly navigating, she is not entitled to recover for a loss occasioned by a collision, which the steamer endeavored to prevent, by adopting the only means in her power.

APPEAL from the Circuit Court of the United States for the Eastern District of New York.

This was a libel by the owners of the sloop "Venus" against the steam-propeller "John L. Hasbrouck," to recover damages for the sinking of the sloop by a collision with the propeller on the Hudson River, near West Point, on the night of Nov. 27, 1869. The District Court held that the collision was caused by the sole fault of the "Venus," and entered a decree dismissing the libel; which decree having been affirmed by the Circuit Court, the libellant brought the case here.

Argued by *Mr. William Allen Butler* for the appellant, and by *Mr. R. D. Benedict, contra.*

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Rules of navigation are ordained, and required to be observed, to save life and property employed in marine pursuits, and not to promote collisions, or to justify the wrong-doer where such a disaster has occurred. *The Sunnyside*, 1 Otto, 210.

Ships and vessels engaged in commerce ought to observe the rules of navigation in all cases where they apply; and it is safe to affirm that they always apply when there is impending risk of collision, except in special cases, where their observance would tend to promote what they were ordained to prevent, or where special circumstances render a departure from them indispensably necessary to avoid immediate danger. 13 Stat. 61.

Both parties admit that the collision described in the record occurred at the time and place alleged in the pleadings, and it appears that the owner of the sloop, having suffered pecuniary loss by the disaster, instituted a libel *in rem* in the District Court against the steamer, to recover compensation for the value of the sloop and her cargo.

Enough appears to show that the sloop was laden with flagging-stone, and that she was bound on a voyage from Catskill, on the Hudson River, to the city of Brooklyn; and that the steamer was bound on a trip up the river, with a barge lashed to her starboard side. Proper signal-lights were displayed by both vessels; and it is not controverted that they both had competent lookouts, nor that they were both well manned and equipped.

Precisely what took place before the sloop reached Newburg does not appear, nor would it be of much importance if it were known. When they left that place, they took in the mainsail and jib, for the reason that the wind blew pretty hard, and it appears that they did not hoist those sails again until they went past Magazine Point, which is on the east shore of the river. Before they reached West Point, all agree that the course of the sloop was well over to the west side of the channel of navigation. Throughout the same period the steamer was

proceeding up the river on the east side of the channel, which is the usual pathway of steamers navigating in that direction.

Sailing-vessels, especially when descending the river, usually keep well over to the western side of the channel, leaving the eastern side of the same for the uninterrupted passage of vessels propelled by steam. Usage has sanctioned that course of navigation, where there are no impediments or natural obstructions in the pathway of ascending or descending vessels. Vessels of all kinds, whether propelled by steam or sails, are allowed and expected to vary their respective courses to correspond with the well-known sinuosities of the navigable portion of the river, and to avoid the dangers of navigation arising from rocks, shoals, and sand-bars, as well as from curves and bends in the banks of the river or the channel of navigation.

Steamers running up the river may make such necessary variations in their course as is necessary to avoid every such natural obstruction to navigation; nor are sailing-vessels descending the river required to hold their course at the hazard of being grounded or shipwrecked by natural obstructions, even though they are required to adopt that precaution in all cases where a steamer is approaching, if the navigation is free from such difficulties. Instead of that, every mariner knows that a sailing-vessel descending the river from above West Point, if her course has been well over to the right bank of the river, must, as she approaches the bend in the river there, incline to port sufficiently to round the projection at that place, even if those in charge of her deck intend to continue down the river on the west side, in the same general course as the vessel pursued before they arrived at that locality.

Variations of the kind in the course of the vessel are allowable, because they cannot be avoided without imminent danger of immediate destruction; nor is a sailing-vessel under such circumstances forbidden to yield to such a necessity, even though those in charge of her deck are aware at the time that a steamer is coming up the river on a course which involves risk of collision, if it appears that a change of course is reasonably necessary to prevent the sailing-vessel from running into the bank, or encountering any other natural obstruction to the

navigation. Necessary changes made in the course of the voyage to avoid such obstructions are not violations of the sailing-rule which requires the sailing-vessel to keep her course whenever an approaching steamer is required to keep out of the way. Departures of the kind from the general requirements of the sailing-rules are rendered necessary to avoid impending peril and immediate danger, which can only be justified in such an emergency, and to the extent that the immediate danger demands their adoption.

Tested by these suggestions, it is clear that the sloop, when she found herself in the cove just above West Point, might properly incline to port sufficiently to clear any obstruction there and to round that point in safety; but it is equally clear that it was her duty, when that object was safely accomplished, to incline to starboard sufficiently to resume her regular course down the river, well over on the west side of the channel. Three considerations should have induced those in charge of her deck to adopt that course: 1. Because it was her regular course, as shown by the usages of the river. 2. Because the steamer was coming up on the opposite side of the river. 3. Because there were no vessels in view coming up on the western side of the channel.

Enough appears in the consequences which followed from the adoption of the opposite course to show that the preceding suggestions should have been adopted and followed, and that, if they had been, the disaster never would have happened. Proof of that is seen in the fact that the steamer, when the sloop emerged from the cove and her lights came in view as she rounded the point, was fast coming up on the eastern side of the river, without the least warning of approaching danger. For a moment the red light of the sloop came in view; but it soon disappeared, and was substituted by the green light, which indicates very clearly that the sloop held her course across the channel instead of inclining to the starboard, as she should have done, under a port helm, in order to resume her regular course down the river on the western side.

Danger being manifest from those indications, the steamer ported her helm and stopped her engine, which was all she could do in the emergency to prevent a collision. Her course

was already well over on the eastern side of the channel, and with a barge lashed to her starboard side she could not bear away much under a port helm, without being in danger of departing from the navigable channel of the river. Witnesses estimate the channel at that point as five hundred yards in width, and all agree that it is a good boating channel.

Hearing was had, and the District Court entered a decree dismissing the libel. Due appeal was taken by the libellant to the Circuit Court, where the decree of the District Court was affirmed, and the libellant appealed to this court.

Proof of a satisfactory character shows that those in charge of the sloop did not change the course of the vessel subsequent to the time when they first saw the lights of the steamer, and the mate of the sloop testifies to the effect that he first saw the lights of the steamer over the starboard bow of the sloop, that they were not then far enough around the point to see straight down the river, and that the steamer at that time was heading to the eastward of the sloop, which shows conclusively that the steamer was so far advanced when the mate made that observation that she could not prevent the collision by stopping her engine.

Conclusive support to the proposition that the sloop did not change her course from the time those on board of her first saw the lights of the steamer to the collision is also found in the testimony of the master of the sloop, in the allegations of the libel, and in the propositions of fact submitted by the libellant. Nothing appears in the record to justify the conclusion that the libellant even pretends that the sloop changed her course subsequent to the discovery of the lights of the steamer, or that those in charge of her deck did any thing to prevent a collision, unless it was to hold her course across the channel, towards the left bank of the river. Evidence to support any thing of the kind is entirely wanting. Opposed to that, the libellant contends that it was the duty of the sloop to hold her course, and insists that the steamer was in fault because she did not keep out of the way, as required by the fifteenth sailing-rule. 13 Stat. 60.

Beyond doubt, a steamer must keep out of the way of a sail-

ing-ship, where the two are properly sailing in such directions as to involve risk of collision; but neither that regulation, nor any other sea law, will justify a sailing-ship in unnecessarily leaving her pathway for the purpose of taking a course directly into the pathway of a steamer in order to compel the steamer to abandon the pathway in which she is properly navigating and seek another usually navigated by sailing-vessels, or incur the peril of an immediate collision.

Litigations of the kind prior to the present have come here, in which the evidence tended to show that steamers, in passing the locality where the collision in question occurred, usually navigate the eastern side of the channel, and that sailing-vessels, whether ascending or descending, usually pass on the opposite side. Testimony tending to prove such a usage in respect to the locality of the collision is exhibited in the case before the court; but the court here is not inclined to rest the decision of the case entirely upon that ground, for the reason that the evidence is satisfactory and uncontradicted, that the steamer was ascending on a course well over to the east side of the channel, and that the sloop, prior to reaching West Point, was descending the river on the western side, in the regular course of navigation.

Neither of those propositions can be successfully controverted: and, if not, the court is of the opinion that the sloop was not authorized to cross the channel to the eastern side; that all she had a right to do in that regard was to incline to port sufficiently to round the point in safety; and that it was negligent seamanship to continue to hold her course across the channel, or to deviate from her regular course, beyond what was necessary to correspond with the sinuosity of the channel; and that it was her duty, when that object had been safely accomplished, to have inclined to starboard, and have resumed her regular course down the river on the western side of the channel of navigation.

Necessary deviation to avoid the obstruction is plainly allowable; but to admit that the deviation may be continued after the necessity for it ceases, would be to concede that the sailing-vessel under such circumstances may hold her course across the channel, and force a collision with a steamer coming up on the

eastern side of the channel, or compel the steamer, if she can, to abandon her accustomed pathway and seek another pathway usually navigated by sailing-vessels.

Attempt is made in argument to exonerate the sloop, or those in charge of her, from all culpable negligence in the premises, by an appeal to the evidence, by which it appears, as the libellant contends, that the wind was not sufficient to enable the sloop to go to starboard after she rounded West Point. Support to that proposition, however, is not derived to any considerable extent from the libel, which, though it describes the wind as very light, nevertheless alleges that there was a strong ebb tide running; and the manifest theory of the libel is, not that those in charge of the sloop made any effort to port the wheel after the sloop rounded West Point, but that she held her course from the time the lights of the steamer were first seen to the moment of the collision.

Considerable conflict exists in the evidence as to the state of the wind; but the great weight of it shows that the wind was from the north-west, and that the theory of the libellant, that it was not sufficient to give steerage-way to the sloop, is not well founded. Important facts are disclosed in the testimony given by the libellant inconsistent with the theory that there was a calm. He, or his witnesses, admit that the wind blew hard before they got down to Magazine Point, so that they took in all sail; and it also appears from the testimony that when they had passed that point they again hoisted the mainsail to the reef, showing very satisfactorily that the wind was still too strong for a full sail.

Four witnesses, including the two pilots and the master and lookout, called by the steamer, testify that the wind was north-west, and that it was blowing a stiff breeze; and they are confirmed by one of the witnesses of the libellant, to the extent that there was a good strong breeze blowing down the river. Two witnesses from the barge were also examined in behalf of the steamer; and they also testified that the wind was blowing a good stiff breeze, and one of them stated that he inquired of the mate of the sloop why he did not have up all sail, and that the mate replied that it was because the wind was so heavy that they came down under bare poles. Five other witnesses

from other crafts were also examined by the steamer; and they all contradict the theory set up by the libellant, that there was a calm which disqualified the sloop from adopting the proper precaution to prevent a collision.

Conclusive evidence, if more be needed, is also found in the injuries which the sloop caused to the steamer by the blow, to show that the theory of the libellant as to the wind is incorrect. That the sloop held her course across the channel has already been shown, and it also appears that she struck the steamer on her port side some forty feet from the stem, the two vessels coming together nearly at right angles. Convincing proof is exhibited to that effect; and it appears that it was the bowsprit of the sloop that first struck the port side of the steamer, and the evidence shows that the force of the blow was such that it broke a hole through the outside planking, which was three inches thick, and also broke a hole through the inside planking, which was also three inches thick, and broke through an oak timber eight inches in diameter.

Viewed in the light of these facts and circumstances, we are all of the opinion that the decree of the Circuit Court is correct, and that there is no error in the record.

*Decree affirmed.*