## THE MEXICO.

### In re COMPANIA TRANSATLANTICA.

(District Court, S. D. New York. February 10, 1897.)

1. COLLISION—STEAMERS—PORTING WHEN GREEN TO GREEN—FAULT.
The Nansemond, on a course N. N. E., crossed, from port to starboard, the course of the Mexico, bound N., 70° W., at least a half mile or a mile away, and brought the lights green against green. The N. then "ported a little," "ported a little more," and when several points on the M.'s starboard bow, less than a minute before collision, "hard a-ported," showing her red light, and soon collided with the M.'s starboard side. *Held*, the N. was in fault for porting when the vessels were green to green, her last order being one of extreme recklessness.

2. REVERSING GEAR CLAMPED—FAULT.
The N. had the reversing gear of her engines clamped fast to the rock arm, so that from one to five minutes was required to release it after notice to reverse. In consequence, the master's signal to reverse his engine could not be obeyed. *Held* a gross fault.

3. OMISSION TO STOP AND REVERSE—SITUATION IN EXTREMIS.
On seeing the green light of the N. suddenly change to red off the starboard bow, and less than a minute before collision, the M. hard starboarded, and kept on at full speed, as the only chance of avoiding collision. *Held*, the situation was in extremis, caused by the faults of the N.: and, whether the course taken was actually the best possible or not, the M. was not in fault for the result.

4. FAULT OF ONE BEING CLEAR, PROOF OF CONTRIBUTORY FAULT MUST BE CLEAR AND CONVINCING.
Where the faults of one vessel are clear, the evidence of contributory negligence on the part of the other should be clear and convincing. Any reasonable doubt of the propriety of her navigation should be resolved in her favor.

This was a petition for limitation of liability filed by the Compania Transatlantica, owner of the Mexico, for damages amounting to $158,226.31, caused by the total loss of the steamship Nansemond and her cargo, in a collision with the Mexico, off the coast of Venezuela, and near the Island of Oruba, on December 21, 1895. The value of the Mexico and of her pending freight was fixed in the limitation proceeding at $60,754.88.

Convers & Kirlin, for petitioner.

Butler, Notman, Joline & Mynderse, Carter & Ledyard, and E. L. Baylies, for damage claimants.

BROWN, District Judge. The above petition was filed to limit the liability of the petitioning company, owner of the steamship Mexico, for damages occasioned by a collision between her and the steamer Nansemond at about half past 2 a. m. of December 21, 1895, to the southward of Oruba Light, near the Gulf of Venezuela, through which the Nansemond and her cargo became a total loss, and her master and others of her crew were drowned.

The Mexico was an iron vessel of 1,359 tons register and 331 feet long, bound from Puerto Caballo to Savanilla, and until shortly before the collision was on a course of N., 70° W. The Nansemond was a wooden steamer, from Wilmington, Del., 165 feet long and of

223 tons net register. She was bound from Maracaibo to Curaçoa, with a cargo of coffee. The night was dark, and at such times her usual course was N. E. by E. until passing Oruba Light, when the course was changed to the southward for Curaçoa. Libels were filed by the owners of the Nansemond and by underwriters on her cargo for the damage, and thereupon the present petition was filed, praying for a limitation of liability, and at the same time denying that there was any negligence on the part of the Mexico, and averring that the accident was solely through the fault of the Nansemond. Much testimony has been taken as to the faults occasioning the collision. The loss of the master of the Nansemond, and the fact that only two persons survived who were on deck at the time of the accident, and that these are of but very moderate intelligence, make the Nansemond's account of the collision very imperfect. It is certain, however, that the mast headlight of the Mexico was seen, when at least a couple of miles distant, more or less on the Nansemond's starboard bow; that the boatswain soon after went to the cabin and called the master, who looked at the light with glasses, and afterwards gave an order to port a little. From the testimony of the Mexico's officers that the Nansemond's green light was first seen about five degrees on the Mexico's port bow, it is probable that the red light of the Mexico may have been the first colored light seen by the master of the Nansemond, or possibly both of her colored lights; but it is further certain from the testimony on both sides that the Nansemond soon crossed the line of the Mexico's course from port to starboard, so as to bring the green light of the Mexico into view, against the green light of the Nansemond. Lendeborg, the wheelman on the Nansemond, did not see either of the side lights of the Mexico until just before the collision; but Hellburg, the boatswain, who had called the master, and who afterwards stood outside near the pilot house, persistently adhered to, and several times repeated, his statements, that the green light of the Mexico was visible when he heard the master give the order to port; and from his testimony it appears that this was a considerable time before the collision. Lendeborg says that the master gave three different orders: First, "port a little," then "port a little more," and finally "hard a-port"; the latter, when the vessels were very near; and that all of these orders were obeyed. The last order was probably less than a minute before collision. The repeated statements of Hellburg (except as to the Mexico being only one and a half points on his starboard bow, which could not be true at the last), agree in general with the testimony of the officers of the Mexico, who say that the Nansemond drew across the bow of the Mexico, when at a considerable distance, from port to starboard, and that she continued to show her green light alone until she was several points on their starboard bow; and that when near, and well off to starboard, the Nansemond showed her red light, as if to cross again, from starboard to port, so as to double up on her course, thus threatening immediate collision; and that as the only means of escaping colli-

sion, the Mexico's wheel was starboarded, and full speed continued, so that her course was changed three points to W. S. W. at the time of the collision, or a little after. Hellburg, the boatswain of the Nansemond, makes the angle of collision about a right angle; the other witnesses make the angle from four to eight points; that is, between the starboard side of the Mexico and the port side of the Nansemond, showing that the Nansemond changed her course from ten to thirteen points.

The above general account of the Nansemond's navigation, incredible almost as it may seem, is so clearly established by the testimony on both sides, that it must be held to be substantially true. I can find only two suggestions in the testimony for even a partial explanation: First, that the master had been drinking, as appears from the testimony of his engineer, who says, "I smelled it off him that night in the engine room door;" and next, the fact that it was near the time for the usual change of the Nansemond's course to southward, and that the master might, therefore, have thought that he would haul off to the southward, across the course of the Mexico, even after the vessels were showing green to green, so that their courses had become entirely safe, and all danger of collision from the original crossing courses had ended.

But these suggestions do not afford the least justification to the Nansemond. Having crossed the Mexico's course from port to starboard, certainly at a distance of from half a mile to a mile, and showing green to green, it was the Nansemond's plain duty to continue green to green until the vessels had passed each other. The final order, "hard a-port," very shortly before collision, was one of extreme recklessness, and was at the Nansemond's sole risk.

The testimony of the engineer of the Nansemond shows still another gross fault on the Nansemond's part, which made reversal impossible when reversal was necessary, for the reversing gear had been made fast by a clamp to the rock arm, which would require from one to five minutes to release after notice to reverse. In consequence of this clamping, the signal of the master of the Nansemond to reverse his engine could not be obeyed.

I do not see how any fault can be imputed to the Mexico. As the hull of the Nansemond could not be seen from the Mexico in the darkness, and the vessels were showing green to green for a considerable time, there was no reason for any apprehension on the part of the Mexico, and therefore no reason for her slackening speed until the red light of the Nansemond suddenly appeared but a few hundred feet distant, broad off on the Mexico's starboard bow. So extraordinary and unaccountable a maneuver might well be bewildering. From a position of apparent absolute safety, collision within less than a minute was suddenly threatened. Whether in this sudden emergency the course taken by the Mexico's officers was actually the best possible or not, she is not responsible for the result. The Nansemond was then so near that it was apparently impossible for the Mexico to avoid her by stopping and reversing. Her only possible chance of escape seemed to be by doing what

her officers testify was done, viz., putting the wheel to starboard, and keeping on as fast as possible. It was a situation in extremis, brought about by navigation so extraordinary and so culpable that the testimony of the Nansemond's boatswain clearly indicates that he recognized it was wrong, though he could not interfere. The language of Mr. Justice Brown, in the case of The City of New York, 147 U. S. 85, 13 Sup. Ct. 216, is peculiarly applicable:

"In view of the recklessness with which the steamer was navigated that evening, it is no more than just that the evidence of contributory negligence on the part of the sailing vessel should be clear and convincing. Where fault on the part of one vessel is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption, at least, adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

And see The City of Paris, 9 Wall. 634; The John L. Hasbrouck, 93 U. S. 405; The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. 159; The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711; The Delaware, 161 U. S. 459, 16 Sup. Ct. 516; The Ludvig Holberg, 157 U. S. 60, 70, 15 Sup. Ct. 477; The E. A. Packer, 49 Fed. 92; The Bywell Castle, 4 Prob. Div. 219.

The counsel for the claimants has presented many ingenious suggestions for holding the Mexico partly to blame. But in the light of the principal faults, as to the navigation of the Nansemond, which are clearly shown by her own witnesses, I see no sufficient ground for holding the Mexico in fault. The story of her officers seems to me in every way consistent, natural and probable; there is no reason to discredit its general correctness. The fault of the Nansemond is clear and gross; and it seems clear to me that when the Nansemond's red light appeared the situation was in extremis.

A decree should be entered finding that the Mexico was without fault.