THE WILLIAM CHISHOLM. THE OCEANICA. LEHIGH VALLEY
TRANSP. CO. v. CHISHOLM et al.

(Circuit Court of Appeals, Sixth Circuit. April 13, 1907.)

No. 1,620.

1. COLLISION—RULES FOR NAVIGATION OF GREAT LAKES—CONSTRUCTION OF
PASSING RULE.

Rule 17 of the rules of navigation for the Great Lakes and their con-
necting waters (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 645 [U. S. Comp. St.
1901, p. 2891]), which provides that "when two steam vessels are meet-
ing end on, or nearly end on, so as to involve risk of collision, each shall
alter her course to starboard, so that each shall pass on the port side of
the other," has reference to the position of the two vessels when they will
be meeting and about to pass each other, and not to their position when
signals are given, if at that time they are on a temporary course from
which they will depart before they will nearly approach each other.

2. SAME—STEAM VESSELS MEETING—VIOLATION OF PASSING RULES.

A collision occurred at night in Lake St. Clair, a short distance below the
lower end of the cut, between the steamships Oceanica, going up, and the
Chisholm, coming down. The vessels were on the usual courses, which
would bring them head on when they approached each other, and the night
was calm and clear. There was evidence tending to show that signals for
passing port to port in accordance with the rules were exchanged, although
that was in dispute; but it was shown without contradiction that, when
the vessels were some 1,500 feet apart and head on the Oceanica gave a
signal of two blasts, which was assented to, and that the Chisholm then
put her helm hard astarboard and swung to port. It was also satisfac-
torily shown that the Oceanica did not starboard her wheel, but either
stopped and backed, or kept to the right, and that the collision occurred
some distance to the eastward of her original course. *Held*, that she was
clearly chargeable with fault adequate to account for the collision, and
that under the rule, which in such case raises a presumption in favor of the
other vessel, which can be rebutted only by clear proof of contributory
fault, the Chisholm could not be held in fault.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 33–42.

Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

3. SAME—DAMAGES RECOVERABLE—REVIEW OF FINDINGS ON APPEAL.

The findings of a commissioner as to the damages recoverable for a
collision, confirmed by the District Court, will not be disturbed on appeal,
except for clear error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 306.]

Appeal from the District Court of the United States for the Eastern
District of Michigan.

On exceptions to the commissioner's report, Swan, District Judge,
delivered the following opinion in the court below:

An interlocutory decree was granted in the above-entitled cause adjudging
the Oceanica solely in fault for the collision between that steamer and the
steamer William Chisholm and dismissing the original libel. It was referred
to the clerk to ascertain and report the damages suffered by the cross-libel-
ants. The commissioner filed his report November 23, 1904. The libelant has
filed nine exceptions to the report.

(1) The first exception includes the allowance to the owners of the Chisholm
for repairs to the hull of the steamer and compensation for the loss of her
use during detention for repairs necessitated by said collision.

(2) The second exception is directed specifically to the allowance of the
item of repairs, $19,040.80, which is embraced in the first exception sub nom.
"repairs."

These may be considered together. The reasonableness of the bills for the work done, and the fact that they were paid, is not questioned. It is denied that all the repairs made were necessitated by the collision. The inquiry is, therefore: Were they made necessary by the collision, or were they in part in renovation of old injuries to the bottom of the Chisholm done prior to the collision. Upon this question there is a conflict of testimony. It is claimed by the libelant that a large part of the repair bill was for injuries previous to the collision. While it is conceded that there were patches on the bottom plates before the collision, the cross-libelants' testimony is that, by settling on the boulders when she sank, these and other plates were impaired by the sinking so as to necessitate removal and rerolling, and that the work done to the bottom and the repair bill therefor is limited strictly to the reparation of the collision injuries and those consequent thereon by the sinking of the Chisholm after the collision. The work of repair, inclusive of the necessary removal of injured plates, required of necessity the repair of beams, angle irons, and other parts and pieces, and their repair and replacement or the substitution of new parts or pieces where required. Without discussing the proofs at length, it is sufficient to say that the evidence is not sufficient to overturn the commissioner's conclusions. These exceptions are overruled.

(3) The third exception is grounded on the allowance of $1,660.05 for lay days in dock while the Chisholm was under repair for the damages to her hull caused by the collision and sinking. The criticism on this item is that it assumes that the work of repairing the steamer's bottom was part of the collision damage, and that but seven days at the utmost were required to repair the break in the vessel's side. This assumption is not justified by the proofs. The steamer was laden with iron ore, and she was greatly injured when she settled on the boulders at the place of sinking. The testimony mainly relied upon that challenges the manner and time in which the repairs were done while the steamer was in dock is that of Mr. Oldham, but his views are not sufficient to override the conclusion reached by the commissioner on the testimony of other equally competent witnesses that it was properly and expeditiously done. The attack upon the order in which the work was done is rather upon the methods and judgment of the company which repaired the steamer. If the bottom was damaged, which is found to be the case, in what order it and other repairs should be made was for the company's determination, and not for the owner of the steamer to decide. Libelant's witness McDowell had no knowledge of the injuries and the repairs necessitated by the collision, except what he saw in the survey. McDowell's deposition, pp. 26, 27. On page 21 he expresses the opinion that $19,000 allowed by the survey "was sufficiently high to cover all the repairs called for by the survey," and, on page 17, that to repair the bottom it would be necessary to have the vessel in the drydock—"longer in the dock for the repairs to the bottom—considerably longer" than would be required for the repair of the top sides. While it may be true that the cost of repairs exceeded the estimate made by the surveyors, it is well known that a survey of this character is merely an estimate and frequently below the cost of the work.

The claim that the repairs to the bottom were not caused by the collision, and that the vessel was in dock longer than necessary, is disproved by the proofs.

It is further objected that the testimony is insufficient to sustain the commissioner's finding as to the extent and cost of the repairs. The degree of evidence insisted upon by libelant is impracticable and unnecessary. It would be impossible for any witness to testify that particular plates, beams, angle irons and other material were put in certain places, or to identify each item charged for as used in reparation of the injury. The survey recognizes most of them as needful for that purpose, and it is sufficient that the shipowner paid in good faith the bill rendered for the work. The presumption is that the work was done bona fide. Fraud is not to be presumed, but must be established clearly. Over six years had elapsed before this testimony on the reference to ascertain and report the damages was taken. This delay was largely caused by libelant. The Chisholm had been repaired entirely before the cause was tried. It would have been impossible for any workman or witness after the re-

pairs were completed to have identified all the several plates, parts, and pieces which went into the work. The painting of the vessel alone, as is customary after the metal has been restored, would have made identification next to impossible. The witness Richardson was present during most of the repairs, and Oldham, libelant's witness. The surveyors certified (Exhibit 28) that she "had been strongly and neatly repaired in accordance with the recommendation" in 1894—five years before this collision. No intervening injury to her bottom is shown until this collision. The bottom damage must be referred to this collision in the absence of proof of another cause. The proof given as to the character and extent of the injuries and of the repairs necessitated thereby, with proof of the bona fide payment of the bills, therefore, is all that can be reasonably exacted in such cases. Orhanovich v. Steam Tug America, 4 Fed. 337–341, approved in The Bulgaria, 83 Fed. 312, 314; The Bratsberg, 127 Fed. 1005; The Providence, 98 Fed. 135.

The onus of proving that repairs other than those resulting from the collision are included in the bills paid is upon the original libelant. The proofs are satisfactory that the Chisholm's bottom was injured—heavily laden as she was with iron ore—when she sank, and they make a case which justified their allowance by the commissioner.

The findings of the commissioner are presumably correct. They stand on the same plane as a master's report in respect to the weight to be accorded to them, and, where they deal with conflicting testimony, are not to be set aside except for clear error or mistake. Egbert v. Baltimore, etc., Co., 2 Benedict, 224, Fed. Cas. No. 4,305; Tilgham v. Proctor, 125 U. S. 149, 150, 8 Sup. Ct. 894, 31 L. Ed. 664; The Providence, 98 Fed. 135, 38 C. C. A. 670. This exception has no merit, and is overruled.

Fourth Exception. This is overruled. The services of the tugs were necessary. The steamer could not be safely navigated after the collision without their aid.

Fifth Exception. This is sustained. It is largely a charge for expenses of the owner of the Chisholm in preserving their rights against the insurers of the steamer. This item of $11.39 is disallowed.

Sixth Exception. This is made to allowance of $90 (Exhibit 5) for tug bills going to and from the sunken Chisholm after the collision. The bill of $10 for tug August 16, 1896, is not sustained by the testimony that the trip was necessary. Of course, it could not be allowed for taking lawyers and insurance agents to the wreck. No specific objection is made to the other items in Exhibit 5, and it is allowed at $80, instead of $90.

Seventh Exception. This must be overruled. The brief for libelant states: "We have no objection to the allowance of Carr's fee." That fee is the only subject of the exception.

Eighth Exception. This is overruled. The voucher states that the trip was made in connection with the repairs, and the testimony of Richardson (page 26) is that his expenses at Detroit and for the trip to Buffalo were not connected with the insurance of the Chisholm. There is no evidence to the contrary. This charge seems sanctioned by Hobson v. Lord, 92 U. S. 412, 23 L. Ed. 613, which is authority for allowing the expenses of an agent for the owner in like cases. If the owner were present in person for the protection of his interest in the injured vessel, in such cases his reasonable expenses and a fair allowance for his time and services would be proper as an element of the damages caused him by the collision. No reason is given why like expenses incurred by his agent in performing the services should not be reimbursed as a natural and necessary consequence of the disaster. The judgment of the commissioner who saw the witnesses and had an experience of 35 years in references involving such questions as are here presented carries great weight, and is not to be lightly disturbed. It would prolong an inquiry of this kind interminably if it were necessary for the owner of the injured vessel, in proof of damages, to adduce the testimony of every shipwright and metal worker who worked upon the repairs to verify each minute charge for labor or material which makes up the aggregate of the expense of restoration of the vessel to her condition preceding the collision or to require a sworn itemized statement of the time spent by each person employed in the work of raising and repair. The inquiry before the commissioner seems to have been search-

ingly conducted by both parties, and that officer had the benefit of full argument by the counsel for the respective parties. His conclusions were apparently the result of deliberation and his characteristically careful consideration. The proofs made it necessary for him to weigh conflicting testimony. It is not enough to discredit his findings that the court might have taken another view of contradicted questions of fact. It must be shown that this judgment was clearly wrong, or that he erred in the law. Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821, 36 L. Ed. 649; The Cayuga, 59 Fed. 488, 8 C. C. A. 188.

Ninth Exception. This objects to the allowance of interest on cross-libelant's damages. The question was elaborately argued before the commissioner, and, as upon every other point in the case, the proofs are conflicting. The considerations urged by both sides were heard at length by the commissioner. The question of responsibility for the delay was the subject of testimony which were weighed by him, and no valid reason is shown for disapproval of his judgment upon that issue. Interest on disbursements for repairs is generally allowed as a part of the damages. It is incumbent on libelant to show error by the commissioner in holding that there was no reason for denying it in this case. The delay in taking the proof of damages would seem to have been held the fault of cross-libelant. The testimony submitted with the commissioner's report, and on which it was based, does not disprove the correctness of his finding on this point. This conclusion must stand, and the exception must be overruled.

The report as herein modified is confirmed, and all other exceptions thereto overruled. This sustains exception 5 and the charge of $10 in exception 6. The sum of the deductions from the amount allowed by the commissioner's report is therefore $21.39.

H. A. Kelley, for appellant.

H. D. Goulder and F. S. Masten, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge. This is a suit in admiralty, wherein the appellant, the Lehigh Valley Transportation Company, as owner of the steamship Oceanica, libeled the steamship Chisholm in a cause of collision. The appellees, claiming to be owners of the latter vessel, answered the libel, denying all fault, and filed a cross-libel against the Oceanica, charging her with being at fault and solely responsible for the consequences which ensued. The cross-libel having been answered, the testimony of the parties was taken in open court, and upon the hearing the libel of the appellant was dismissed, and the cross-libel of the appellees was sustained. The damages, with interest, were assessed at the sum of $61,618.65. A decree was entered for that amount and costs in favor of the cross-libelants. The damages of the Oceanica probably amounted to nearly an equal sum.

The collision occurred a short distance below the lower end of the Cut, a dredged channel 800 feet wide, in Lake St. Clair, at about 11 o'clock of the night of August 14, 1896. The Oceanica was a vessel about 262 feet long and 16 feet draught and was bound up, having a cargo of coal of 1,900 tons. The Chisholm was nearly as large, and was coming down carrying about the same tonnage of iron ore. A mile and three-quarters below the Cut is Windmill Point, on the port hand of vessels coming up, and on passing that the usual course for vessels of this size is, or was at that time, laid on the Lower Beacon Light, standing near the east side and at the lower end of the Cut. This course is straight east northeast, and is followed about

a mile and a half until the vessel approaches the lower end of the Cut, whereupon it swings to port about $1\frac{1}{2}$ points and proceeds up, or near, the midway of the channel. The course of vessels coming down is the reverse of this. The weather was calm and clear, and there was nothing in the conditions to create any difficulty or embarrassment in the navigation of the vessels. While the Oceanica was bearing up from opposite Windmill Point, on her heading for the Lower Beacon Light at the east side of the foot of the Cut, the Chisholm was coming down the channel above. The Oceanica, directly after passing Windmill Point, had passed on her port side a tug and tow going down, with which she exchanged a signal of a single blast. The Chisholm, on coming to the lower end of the Cut, or shortly before, saw coming up on her starboard bow a small steamer, which proved to be the Cottrell and a tow. With this steamer she exchanged a signal of one blast and passed it starboard to starboard; the little steamer swinging in as the Chisholm passed out of the Cut. Thus far there is no difficulty in perceiving the situation, and we come to the period when the Oceanica and the Chisholm began, or should have begun, to establish their understanding for passing each other. From this time on, until immediately before the collision, the testimony, especiallly that concerning the signals given by each of the vessels, and much that relates to the distances between them when the signals were given, and to the maneuvers of the Oceanica for a few minutes before the collision, is in an almost hopeless conflict. The libel for the Oceanica charges that the signaling, distances, and maneuvering of the vessels were as follows:

"That the said steamers continued on their respective courses, and when within the usual signaling distance the Oceanica sounded two blasts of her steam whistle to the said steamer Chisholm, which was answered by two blasts from the Chisholm. That at the same time the helm of the Oceanica was starboarded slightly. The Chisholm was then nearly ahead, and showing her green and range lights, indicating that she would pass the Oceanica starboard to starboard. That the steamers continued to approach, until they were a short distance apart, when suddenly the Chisholm blew one blast of her steam whistle, and exhibited all of her lights to the watch on the Oceanica. The Oceanica replied with two blasts of her whistle, and her engine was immediately checked. The Oceanica then blew four or five short blasts of her whistle, and her engine was stopped and backed. But the Chisholm, without apparently reducing her speed, came on, swinging rapidly to port, and struck the stem of the Oceanica, crushing her in forward, below the water line. The headway of the Oceanica was almost stopped, and the force of the collision drew her stem around to the eastward. The engine of the Oceanica continued to back until she backed away from the Chisholm, when she turned around down the river, under a hard aport helm. The water coming in rapidly, she was headed to the westward and an effort made to reach shallow water, but she sank in deep water."

The Chisholm's statement in her answer and cross-libel is as follows:

"The Oceanica blew to the Chisholm a passing signal of one blast, to which the Chisholm promptly responded with one blast, the vessels being then substantially end on, and was about to port and draw over to starboard, the order having been given, when the Oceanica blew to her a passing signal of two blasts and shut out her red light, evidently having starboarded. The distance and positions of the vessels fully warranting it, the Chisholm replied with two blasts and promptly starboarded, in accordance with the signal, and was swinging under starboard helm. The vessels were about to pass starboard to

starboard, with no risk of danger of collision present, when, as they approached close to each other, the Oceanica opened up her red light again and blew one short blast of her whistle. The positions of the vessels then, the short distance separating them, and the fact that the Chisholm was swinging under starboard helm, made it impossible to recover and pass under single blast whistles, port to port, and so the Chisholm at once signaled to reverse her engine full speed astern, which was promptly done, engine whistles being heard on the Oceanica, but the Oceanica, swinging rapidly to starboard, came into the Chisholm, then well to the eastward, with her headway nearly or quite stopped, striking her on her starboard quarter, abreast of the engine room; and such was the speed of the Oceanica and the weight and force of her blow, delivered stem on, that she cut into the Chisholm some 10 feet, making a breach down to her bilge, through which the water poured in such quantities that the stern of the Chisholm sank immediately to the bottom, substantially where she was struck."

Thus it is seen that a very important question is whether the first passing signals given and answered were double blast signals, as claimed by the Oceanica, or single blast signals, as stated by the Chisholm. The crews on each vessel, as usual, maintain in their testimony the contest made by each; but, before passing to the proofs, we should recur to the original libel. It is there alleged that the first signal was a double-blast signal from the Oceanica, and that this was replied to by two blasts from the Chisholm. Both sides agree that at one time double blast signals were exchanged, though they do not agree as to the time when this occurred. The allegation of the libel of the appellant is that the Oceanica began the signaling with two blasts, and that at that time the Chisholm was "nearly ahead." The Chisholm was at that time, it says, showing her green light, and that she was then coming out of the Cut. Her course would then be, according to the usual navigation, to swing to starboard down the reach toward Windmill Point, and the vessels would then be nearly end on. Such would be their position as they would approach each other, and such by the concurrence of the testimony from both vessels was what in fact occurred. By rule 17 of the rules prescribed for the navigation of the Great Lakes and their connecting waters by the Act of February 8, 1895, c. 64, § 1, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2891], it was provided that:

"When two steam vessels are meeting end on, or nearly end on, so as to involve risk of collision, each shall alter her course to starboard, so that each shall pass on the port side of the other."

Obviously, this language has reference to the position of the two vessels when they will be meeting and about to pass each other, and not to their position when signals are given, if at that time they are on a temporary course from which they will depart before they will nearly approach each other. The Iron Chief, 63 Fed. 289, 11 C. C. A. 196, 22 U. S. App. 473; The John L. Harbrouck, 93 U. S. 405, 23 L. Ed. 962; The Victory and The Plymothean, 168 U. S. 410, 418, 18 Sup. Ct. 149, 42 L. Ed. 519; The D. S. Stetson, 4 Ben. 508, Fed. Cas. No. 4,104; The John Taylor, 6 Ben. 227, Fed. Cas. No. 7,429; The Velocity, L. R. 3 P. C. 44; The Oceano and The Virgo, 3 Prob. Div. 60; Mars. Collisions (2d Ed.) 473.

The cases of the Velocity, supra, and of the Iron Chief, a case decided by this court, are good illustrations of this rule, the former be-

ing a case of collision in the River Thames, and the latter of a collision near the change of course from Waiska Bay into the channel below—and see the observations of Brett, L. J., in the Bywell Castle, 4 Prob. Div., at page 224. What we have here said is because the libel for the Oceanica states, as if it were a factor indicating the propriety of her course, that when the first passing signals were given "the Chisholm was then nearly ahead and showing her green and range lights, indicating that he would pass the Oceanica starboard to starboard." The captain of the Chisholm says that at about that time she had the other vessel's green and red lights, which, of course, would locate his vessel as dead ahead of the Oceanica; but he also says that he was then turning down out of the Cut and coming on to the course toward Windmill Point. It is obvious that in these conditions the Chisholm would be showing her green lights to the other vessel until she had completed her turn and was substantially head on with her, and if, as her libel implies, the Oceanica accepted the green light as an indication that the Chisholm intended to pass her on the starboard hand, it was at fault in adopting that conclusion.

But the testimony leaves no doubt that these vessels were meeting each other nearly end on for an amply sufficient time to comply with the seventeenth rule, and the answer and the proof of the Chisholm are to the effect that, at the time when the passing signals of two blasts were exchanged, the vessels were coming into that position. In these conditions the Oceanica was at fault, if, as her libel tends to show and her testimony states, she at no time gave other than double-blast signals. This she had no right to do, if they required her to take the wrong course. But we are satisfied that her libel in this respect is not true. On the contrary, we are convinced that she gave and received a signal of a single blast a considerable time before she gave her signal of two blasts, and that the latter was not given until the vessels nearly approached each other. This for several reasons: First, because from her position she would be likely to choose the ordinary way of passing; second, because the original exchanging of a single blast and the later giving of a double blast by the Oceanica explains, and is consistent with, the action of the Chisholm. It seems incredible that she should have so suddenly swung off to port under a hard astarboard wheel, unless she had suddenly been constrained by the Oceanica to alter her previous course; third, because it seems to us that the nearness of the Oceanica to the Chisholm, when, as the Oceanica states, the double blasts were exchanged, indicates that pilots having proper regard to their duties would not have so long delayed their passing agreement; besides, there is a quality in the evidence of those on the Chisholm which is more persuasive than that coming from the Oceanica, and the judge of the District Court, who saw and heard the witnesses, seems to have had the same impression; finally, the case made for the Oceanica is so irreconcilable with the locality of the collision that confidence in any part of the testimony is seriously shaken.

One would have expected that some light upon the circumstances of the collision might have been shown by the crew of the Cottrell, which was not far off. The captain of that vessel was called by the

judge to testify; neither of the parties being willing to vouch for him. But his testimony proved pointless and inane.

The darkest part of the case is the conduct of the Oceanica after the time when she gave her two-blast signal, and when she saw the Chisholm turning out abruptly on her hard astarboard wheel. There was no reason why she should not have turned to port and proceeded in accordance with her response. There was even less danger in doing that than in remaining where she was or in checking and backing, which would have a tendency to throw her stem to starboard. She gave testimony tending to show, and her counsel argues, that she nearly stopped in her course and remained almost dead on the line where she was, overcoming her progress by checking and backing, and that while she was doing this she was struck on her stem by the broadside of the Chisholm; but there are strong indications which discredit even this story, faulty as this conduct would have been. The captain of the Oceanica testifies that the Chisholm was already sunk on her heel when the two vessels came apart after the collision, and she was later found there, with her head down stream, apparently drifted around on her heel, in the direction of the current, while sinking. The place where she sunk was about 800 feet distant to the east from the course which the Oceanica would have taken if she had gone straight ahead. This demonstrates that the Oceanica had, after her signal, gone far off to starboard, and is very persuasive that she was not checking and backing until immediately before the collision. It seems difficult to believe that her conduct could be so wanton; but, in this maze of contradictions in the proof, one's judgment feels on safest ground when it finds a substantially incontestable fact from which to estimate the probabilities; and the place where the collision occurred is satisfactorily proved. The severity of the wound in the side of the Chisholm by the stem of the Oceanica, an opening 18 feet in length from top to bottom and 6 feet wide, while not conclusive, rather tends to confirm the belief that the Oceanica was still advancing with considerable speed at the time of the collision, notwithstanding she had reversed her engine a short time before, as the evidence seems to prove.

We have no hesitation in holding that the Oceanica was rightly condemned.

We are next required to consider the case against the Chisholm. The testimony from those on that vessel, to which, as we have said, we are inclined to give the greater credit, is that, while the vessels were at a proper distance apart, the Oceanica blew a passing signal of one blast, to which the Chisholm responded with one and checked down; that at this time the vessels were nearly ahead of each other; that the Chisholm ported her wheel a little; that they continued to approach each other, both vessels showing their green and red range lights; that when they were about 1,500 to 2,000 feet apart, and there was no difficulty in passing either port to port or starboard to starboard, the Oceanica blew a double blast, to which the Chisholm responded with two and immediately turned her wheel hard astarboard, turning out sharply to port, and closed out the red light of the Oceanica; that soon thereafter the Oceanica showed her red

light again and blew one blast of her whistle, to which the Chisholm did not reply, but signaled her engineer by two whistles to reverse, which was done; that the signal to the engineer was repeated, and a further signal was given to back the vessel, and these orders were complied with; that the result of the backing was to turn the stern of the Chisholm away from the· direction the Oceanica was then coming, but the latter struck the Chisholm on her starboard quarter, near the engine room, well aft, at about a right angle; that the Chisholm filled rapidly at the opening and sank on her heel. If these were the facts, we see no fair ground for reversing the decree which absolved the Chisholm from fault. We are convinced that the account she gives of her conduct is substantially correct. Some criticism is made by counsel for appellant upon the statement that the Chisholm put her helm hard astarboard and swung out so rapidly to port on getting the double-blast signal of the other vessel and of her captain's explanation, when he says: "I wanted to quit that business. I wanted to get far enough away, so there would be no more exchanging of whistles." But if, as he says, there had been a reversal of the original signal, and that at the near approach of the vessels, we do not think his explanation altogether unreasonable. But both sides agree that in fact the Chisholm swung out rapidly, as stated. She must have had some motive for it; and if, as we think, her turning to port was done upon the invitation of the Oceanica, it does not lie in the mouth of the latter to complain of it. The Chisholm went off into water where the Oceanica had no right to be, and where the Chisholm was in no other danger.

We have discussed the case, as we suppose, upon all the relevant material facts, and do not differ from the conclusions of the District Court; but, upon a closer analysis of the more critical facts, we think it might be fairly summed up in this: That, without deciding the controversy whether a passing signal of a single blast had been exchanged or any other issue concerning preceding events, we find upon the concurrence of the testimony of both sides that the two vessels were approaching each other head and head, or nearly so, for a length of time before they would meet amply sufficient to make provision for passing. If they continued on such courses, there would be risk of collision. If the Oceanica, before the vessels were laid on these courses, but in anticipation thereof, had given a signal of one blast, as it was her duty to do, and that had been assented to, she had no right to change it, being under no necessity, and the other vessel was bound to assume that they were to pass port to port until the Oceanica gave clear signs that she was not complying with the agreement; if she changed her purpose while they were proceeding end on and blew two blasts, she was bound to proceed accordingly and go out to port. But if, as she claims, she had given a double blast before the vessels came head and head, and had given no other, she was equally bound to go to port for passing, and in either case there was nothing in the conditions which made this dangerous or difficult. Her double blast would mean to the Chisholm "I am directing my course to port." If she was in doubt of the intention of the other vessel, she was bound to give an alarm whistle and check or stop and reverse, if necessary,

as required by rule 26; but, if she gave no notice of any embarrassment, the Chisholm was entitled to assume that she had none, and proceed accordingly. Thus, upon any fairly possible construction of the facts, the Oceanica was grossly at fault. By her own account, although she at no time gave or assented to any other than a double-blast signal, she was never on the west side of the midway of the sailing course, and, if the clear indications are to be relied upon, she came into collision at least 800 feet to her starboard of the course she had been proceeding on, and she had given no notice of any doubt or difficulty, unless it be that she was whistling at the time when the collision was impending and beyond escape. It seems clear that but for her misconduct the collision would not have happened.

In these circumstances, the Chisholm is entitled to be judged by the rule long followed by the courts of England and of this country that when one vessel, clearly shown to have been guilty of a fault adequate in itself to account for the collision, seeks to impugn the management of the other vessel, there is a presumption in favor of the latter, which can be rebutted only by clear proof of a contributing fault. The Catherine, 2 Hagg. Adm. 145; The Sisters, 14 L. T. N. S. 338; The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943; The Umbria, 166 U. S. 104, 409, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Victory and The Plymothean, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519; The D. H. Miller, 76 Fed. 877, 22 C. C. A. 597, 33 U. S. App. 717; The Comet, 9 Blatchf. 323, Fed. Cas. No. 3,051; The Sunnyside. 1 Brown's Adm. 227, Fed. Cas. No. 13,-620; The Athabasca (D. C.) 45 Fed. 651; The Mexico (D. C.) 78 Fed. 653.

Tried by this rule, we think the Chisholm could not be justly held responsible. But it seems proper to say that, aside from the rule just mentioned, we should be unable to specify any ground on which we should think it right to charge that vessel.

Some questions are presented by the brief of appellant in regard to the extent of the damages recovered. One is in substance that in making repairs on the Chisholm it was found that some of her bottom plates were indented and broken, and it is alleged that they were in a defective condition at the time of the accident, and that the appellant should not be charged the expense of new material; and, further, that more new plates and more extensive repairs were made and charged for than was necessary to renew the vessel. There is evidence to show that the bottom of the Chisholm was considerably bent and the plates somewhat broken; but there was evidence that she sank on stony ground, and that the boulders under her may have been responsible for the condition of her bottom. There was also conflicting evidence in regard to the necessity for so much new material in making repairs; but these matters were fully considered by the commissioner, and his findings were confirmed by the court. We do not find such clear error in this regard as would, under the established rule, justify us in disturbing the decree. The Cayuga, 59 Fed. 483, 8 C. C. A. 188; The La Bourgoyne, 144 Fed. 781, 75 C. C. A. 647.

The commissioner's report included interest on the damages, as is the usual practice. The appellant objected to this, for the reason that the case was so long spun out by delays in taking the testimony, which continued for several years; and the delays it is said were caused by the counsel for the appellees. It is not clear to us that the ground as stated is sufficient to require the withholding of interest. But, in all events, the court below knew more about the circumstances than we can know. In fact, there is nothing in the record which we can lay hold of in order to judge whether the complaint is well founded or not, or whether one side was more responsible for the delay than the other.

The result is that the decree of the court below must be affirmed, with costs.