## THE MEXICO MARU.

(District Court, W. D. Washington, S. D. February 3, 1921.)

No. 2596.

1. **Collision ⬥69—Anchorage ground designated by city held lawful.**
    In the absence of designation of anchorage grounds in a port by the Secretary of War, as authorized by Act March 4, 1915, § 7 (Comp. St. § 9959a), a vessel is protected in anchoring as customary on an anchorage ground designated by city ordinance and the port warden.

2. **Collision ⬥72 (1)—Mutual faults of moving and anchored vessels.**
    A vessel moving from harbor at night *held* in fault for collision with an anchored vessel, for moving at too great speed over the anchorage grounds in the foggy condition of the atmosphere, and the anchored vessel *held* chargeable with contributory fault, for failing to sound fog signals, on evidence that the fog was shifting and varying in density, rendering it uncertain how far away her lights could be seen, and that she was anchored near one corner of the grounds, where she was liable to be in the way of vessels leaving the harbor.

In Admiralty. Suit for collision by the Booth Fisheries Company of Delaware and others against the Japanese steamer Mexico Maru, Osaka Shoshen Kabushiki Kaisha, claimant, and the City of Seattle, intervener, with cross-libel by claimant. Decree holding both vessels in fault.

Bogle, Merritt & Bogle, of Seattle, Wash., for Booth Fisheries Co. and others.

Huffer & Hayden, of Seattle, Wash., for The Mexico Maru and others.

Walter F. Meier, Corp. Counsel and Edwin C. Ewing, Asst. Corp. Counsel, both of Seattle, Wash., for city of Seattle.

CUSHMAN, District Judge. The case is one of collision between two vessels, and the questions involved are almost entirely of fact. The Mexico Maru, hereinafter called the Mexico, a steamer 400 feet in length, at 12:55 a. m., October 30, 1918, left her wharf on the East waterway at the port of Seattle for Tacoma. At 1:33 a. m. she was in collision with the A. J. Fuller, hereinafter called the Fuller, a full-rigged American ship, 229 feet long, which was lying at anchor within a certain portion of Elliott Bay designated, in the year 1915, by a city ordinance of Seattle as an "anchorage ground."

It has been stipulated that the court shall first determine the fault of which vessel caused the collision, or whether both were in fault, before considering the other questions involved. A comprehensive statement of the vast amount of evidence taken is not feasible. The testimony of many of the witnesses can be reconciled, to some extent, on the assumption that, prior to about 2 o'clock, the denser fog was, for the most part, confined to the waterways along the face of the docks and off the shore of Harbor Island.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Taking into account the changing conditions of the fog, the drifting of the banks, the liability of witnesses to be mistaken in the matter of time and distances, the matter the particular witness had in hand as bearing upon his reason to observe and recollect the fog conditions, and further making allowance for the interest of the witnesses and the lapse of time after the occurrence and prior to the taking of testimony, many of the contradictions in the testimony are more apparent than real. Yet there is a large amount of testimony that it is impossible to reconcile.

As the tendency of witnesses aboard colliding vessels to be loyal to and partisans of their own ship is well recognized, when the testimony of such witnesses is not consistent, I have given the greater weight to the statements and admissions made by them against such recognized bias. The outstanding and, as the court considers, the controlling facts are as follows:

[1] Claimant disputes that the anchorage ground set apart by such ordinance was privileged ground, and contends that the city's action was contrary to the Act of Congress of March 4, 1915, c. 142 (38 Stat. p. 1053 [Comp. St. § 9959a]), which provides:

"Sec. 7. That the Secretary of War is hereby authorized, empowered, and directed to define and establish anchorage grounds for vessels in all harbors, rivers, bays, and other navigable waters of the United States whenever it is manifest to the said Secretary that the maritime or commercial interests of the United States require such anchorage grounds for safe navigation and the establishment of such anchorage grounds shall have been recommended by the Chief of Engineers, and to adopt suitable rules and regulations in relation thereto. * * * "

The War Department not having acted in pursuance of the statute and this being a usual and customary anchorage, claimant's contention is without merit.

It is shown that the Fuller had permission from the office of the port warden to tie up at buoy No. 2 in the anchorage; that she had been at that buoy for several days (since the afternoon of the 23d of October); and that the fact that she was at that buoy during this time was known to the pilot and captain of the Mexico, they having seen her there as late as the day before the collision. This renders immaterial any question as to the regularity of the permission to tie the Fuller up at that buoy.

[2] The East waterway lies west of certain wharves of the city, between such water front on the east and Harbor Island on the west, the fairway, or channel, north of the East waterway, extends along such water front between it and the anchorage. Harbor Island lies between the East and West waterways. The anchorage ground lies north of Harbor Island and between the channels or fairways, which are extensions of the East and West waterways. The anchorage ground is, roughly, half a mile or more square.

As Elliott Bay opens to the westward, all vessels, ordinarily, on entering or leaving the channel extending north of the East waterway, make an abrupt turn around the northeast corner of the anchorage

270 F.—51

ground. Such vessels probably form more than half of the shipping entering and leaving the port of Seattle in the course of a year. Within the anchorage and adjacent to this corner, buoy No. 2 was located. Exactly how near the east and north boundaries is not shown, as the buoy went down with the Fuller. The Fuller was anchored some 1,000 feet west of the east boundary of the anchorage, and some 600 feet south of the north boundary. The Fuller, at the time of the collision, swung to the northwest of the buoy, all parts of her within the anchorage. The fairway east of the anchorage, opposite buoy No. 2 is approximately 1,900 feet wide.

There was a heavy fog, varying in density in the East waterway at 12:55, when the Mexico left her dock. It took her until 1:28 to run out of this fog. The point at which she did so, while not exactly established, must have been opposite the Skinner & Eddy shipyard. This point could not have been much farther than 2,500 feet from the Fuller.

Up to this time the first and fourth officers had been on lookout on the forecastle head, while the captain and pilot, together with the third mate at the engine room telegraph, a quartermaster at the wheel, and an apprentice officer keeping the log, were on the bridge. On passing out of this heavy fog, the captain testified that he had a visibility along the water front to the north for a half mile, meaning, evidently, that he could see the lights along the pier fronts for half a mile. Had it been clear in the ordinary sense, he could have seen the lights along the water front to Smith's Cove and the city lights on the hill beyond.

Capt. Oniya, on the bridge of the Mexico, testified that from this point, which he described as the wider part of the bay, the fog was not very thick, that it was misty, and that he noticed no change in it until the Mexico struck the Fuller, which occurred about five minutes later. The Mexico had to this point, where she came out of the heavy fog, been going under "slow"—"stop" signals, taking over 30 minutes to reach this point, which is not more than 5,300 feet from the wharf she had left. As she came down the waterway, she frequently sounded fog signals. Immediately after emerging from the fog north of the entrance of the East waterway, the pilot increased the speed and changed his course from north-northwest to west by south, and the captain recalled the first mate from the lookout. The latter officer went below, where he remained until the collision.

Prior to the change in course, the captain mentioned to the pilot the position of the Fuller. The pilot testified, and evidently calculated, that the Mexico, with her momentum, would be slow enough in responding to her helm to carry her so far north that, on making the turn, he would pass beyond where the Fuller was lying at the buoy. The true explanation of his miscalculation I find to be in the way the Mexico was loaded. Her draft was 11.3 forward and 20 feet 9 aft. Being down at the stern made her liable to turn more quickly than usual in response to her helm. The pilot probably did not make due allowance for this. He may not have known it, for, from the time he

came aboard until the Mexico left her wharf at 12:55, he was asleep a great part of the time.

Libelants' contention is unsupported by the evidence; this contention being that the Mexico left the fairway and cut across the anchorage immediately after passing the red spar buoy in the southeast corner of the anchorage. There must have been a heavy fog at this point, rendering such a maneuver unlikely. The pilot testified, and his pocket log of former trips corroborates him, that he never departed or took a departure in that manner, save in daylight and clear weather.

The testimony of those aboard the Mexico indicates that there was but one change of course. If the Mexico had left the fairway at this point on that course, she would have missed the Fuller. If the Mexico, so departing, because of being down by the stern, had turned more rapidly, as has been found, than the pilot calculated, this would carry her still further from the Fuller. If the pilot had knowingly taken a course across the anchorage in the direction of the Fuller, he would have been on the lookout for her, which does not appear to have been the case.

In reaching my conclusion, I have given much weight to the testimony of the witness Harding, who was night foreman for the Pacific Coast Coal Company. He is the only disinterested witness who testified to seeing the Mexico making this maneuver. He testified that he saw her come down the fairway and turn off the bunkers, upon which he was at work, and disappear in the fog in the direction of the Fuller. These bunkers are east of, and constitute the nearest point on the water front opposite, the point of collision. The Mexico must have begun to turn before she was directly opposite the bunkers.

At about 1:32, the captain of the Mexico saw the light of the Fuller and said to the pilot, "What is that light?" to which the pilot made no response. The pilot had been looking back, as he testified, over the starboard quarter, watching the lights on the Smith Building and the Great Northern Station, to see how fast he was swinging, and determine when he was on his course, which was the Duwaumish bell buoy. It may be that the glow of the city lights dulled his vision for a moment, or that he misunderstood the direction indicated by the captain's question. The reason is not important. Without question it was a few moments after the captain saw the Fuller's light before it was seen by the pilot.

The first time the captain was asked, he said it was 10 seconds after he saw the light before the pilot gave the order "Hard aport," and 9 or 10 seconds more before he gave the order "Full speed astern." Again, he testified that it was 6 or 8 seconds. The effect of his testimony is that he does not undertake to estimate the time with exactness; but it is apparent that there was a substantial lapse of time after he saw the light before the pilot observed it.

At the same time that the pilot saw the light, came the call from the lookout, "There is a light ahead! a light ahead!" The lookout was about 200 feet forward of the bridge, and probably did not see the light as soon as the captain, because of the thicker condition of the

atmosphere near the water. The contention that he did not keep a lookout far enough to port as the vessel turned is possible, but hardly tenable, as the order to the helmsman to steady her on her course was given before the light was seen.

Although the captain and pilot only saw the forward light of the Fuller, the lookout saw, at about the same time, both the forward anchor light, dead ahead, and the after one over his port bow. The third mate at the engine room telegraph saw two lights on the Fuller right after the order "Full speed astern." In about a minute after the pilot saw the light, the collision occurred, from which, and the opinion of the witnesses as to the distance, it would appear that the Fuller could not have been more than 300 feet distant when her light was seen.

The Mexico struck the Fuller at about right angles on her starboard bow. The Mexico backed away, crossed to the port side of the Fuller, and stood by until 2:25 a. m. In the meantime, the mate and watchman of the Fuller, the only men on her, came aboard the Mexico. The Fuller sank in 30 fathoms of water. Before the departure of the Mexico from the scene of collision, the fog had become thick over the entire anchorage and nearby waters of the bay. The lights upon both vessels were sufficient, properly placed, and burning.

The foregoing shows a clear fault on the part of the Mexico, in that she navigated across the anchorage at too high a rate of speed in the obscured condition of the atmosphere. So concluding, it is unnecessary to determine the question of the sufficiency of the lookout.

The remaining question is whether it is shown with sufficient certainty that there was fog or mist of such density that the Fuller was also at fault for failing to ring her fog bell. This is the most difficult of the various questions in issue to determine, because it was, not only night, but late at night, when the collision occurred. The condition of the fog was changing, as banks drifted north out of the East and West waterways, and as the fog passed or formed over the anchorage. The tide was flood at 2:12 a. m. There must have been slack water for some time prior to the collision, which would allow the backed fresh water of the East waterway, into which emptied the Duwaumish river, to spread out upon the surface of the water of the anchorage. The temperature of the atmosphere is shown to have been 45° at midnight and 41° at 4 a. m. The temperature of the water is not shown. Owing to the time of year—long after the melting of the snow in the mountains would chill the surface waters of the Duwaumish—I conclude that it was not a cold surface fog, but rather a "steaming pot fog"; that is, one where the water is warmer than the atmosphere. If it was a cold surface fog, one where the water chilled the moist-laden air near its surface, it would, probably, not have first appeared in the waterways, where the fresh water was then backed up.

When the fog became dense over the anchorage, no one testified that it came as a bank from the south, or drifted over the anchorage from the south. No one testified that there was any increase in the wind from that direction at that time to carry it over the anchorage. It

formed first in the waterway, where the fresh water would be held back by the incoming tide. Its appearance over the entire anchorage corresponds very nearly with the change of tide, when the backed-up fresh water would be released. This fog is described by the pilot and captain as rolling up above the ship and at times shutting out the stars.

This could not be a characteristic of a cold surface fog, for the cold surface would help to hold the colder, and therefore heavier, air nearest the surface. But the contrary would be true where the surface of the water was warmer than the air, for, as the air was warmed nearest the surface, it would rise, carrying the fog with it, and this probably accounts for this characteristic, as described by these witnesses. It may also account for the lack of uniformity as to the density of the fog described by the witnesses, as it is obvious that there would be more disturbance of the fog-laden atmosphere rising from a warm surface than when held by a cold one.

From this I conclude that the dense fog appearing over the anchorage after the collision was caused by the warm fresh water from the East and West waterways spreading over the anchorage as the tide slackened, and that it was forming at and prior to the time of the collision. This would afford an explanation of why the watchman of the Fuller considered the fog sufficient to ring his bell twice before the collision, once at 12:30 and again at about 1:10. A temporary lulling and moving of the air from the south would permit of its forming and being carried away.

Numerous witnesses testified as to a bank of fog passing out of the East waterway prior to the collision. Even allowing for a mistake in the recollection of time on the part of the witnesses, as to exactly when this bank of fog passed north opposite the Fuller, and assuming that it extended west over the anchorage, it would only account for the necessity on the part of Johanson (the watchman on the Fuller) to ring his bell once, and would leave the other fog unaccounted for, except that it was forming in the anchorage, or other banks, unnoticed by the witnesses, were passing over the anchorage from off Harbor Island.

Libelants contend that the witness Harding, who testified to seeing the Mexico turn off the bunkers and disappear in the fog, was mistaken, in that her disappearance is to be accounted for by her reaching a point, as she crossed the anchorage, where the screens back of her lights shut them from Harding's view. This is not persuasive, for Harding testifies that he was expecting a vessel in at the bunkers to load coal, and he thought the Mexico was probably the vessel; that he was watching her, and that he thought she was making a turn preparatory to coming into the bunkers. Under these circumstances, it is hardly to be presumed that a witness would be deceived as to whether the vessel was turning or not. While the lights of the Mexico might have been shut out in the manner indicated, this witness did not see the lights of the Fuller, which were in no manner obscured, unless by fog.

Beecher, pilot of the Mexico, says he could see a half mile along the water front, and the lights in such tall buildings as the Smith and Great Northern Station, and the lights on the hill. Other witnesses speak in the same way regarding the hill lights. The lights seen by him a half·mile or more along the.piers to the north as he came out of the East waterway at the time of turning for the Duwaumish bell buoy are not shown to have been of the limited power of the Fuller's anchor lights.

If the question to be determined was whether there was a heavy fog over the anchorage, the ability to see the shore lights would be more important than it is in this case. The glow of the city lights along the·water front east of the anchorage may have been visible for half a mile; but I am convinced that the individual ship lights were not visible for that distance from the direction of the East waterway, or from the channel to the east of the anchorage, and probably for not more than half that distance.

. In determining whether ship lights were or could be seen, it is necessary to attach much importance, not only to what the witnesses testify to having seen, but also to what they did not see, or failed to mention having seen. One reason for concluding that there must have been fog over the anchorage on this night is that it is about the only way to reasonably account for the imminence of the collision when the Fuller's lights were first seen by three apparently vigilant men on watch upon the Mexico. Save those on the colliding vessels, not one of the·witnesses who heard the crash of the collision, or the halloing following the collision, claim to have been able to see the lights of either vessel at that time.

Johanson, the watchman aboard the Fuller, did not see the searchlight played from Pier 1 during the night prior to the collision; Pier 1 being less than a mile away. The operator of the searchlight testifies that he was unable to see the Fuller, although on the previous night he remembers having seen her in the rays of his light. Johanson testified to seeing the lights of the city on the hill; that, just before the collision, it "got a little kind of hazy," but that he could "see·them .plain." When asked about the lights of West Seattle at this time, he said:

"I could not see them as clear at the time of the collision as I could before 12 o'clock, but I could see them."

Other witnesses testified to being able to see the stars, even when in the heavier fog in the waterway and along the waterfront. This would tend to show that the fog was low-lying, and tend to explain the watchman's being able to see the lights on the hill.

The ship Corruthers lay at anchor about a mile to the south and west of the Fuller; but Johanson does not testify to being able to see the lights on the Corruthers. The watchman on the Corruthers on this night testified that he saw the Fuller's lights during the night prior to the collision and that later he heard shouting in the bay. Although there is some confusion on account of the time testified to by

this witness as to when he heard this shouting, it must have been from those on the Mexico and Fuller after the collision. He testified that he looked in the direction of the voice, but could not see the Fuller's lights.

Another witness on the docks, about half or three-quarters of a mile to the southeast of the Fuller, testified to having seen her lights after 12 o'clock. The effect of his testimony is that he saw the lights, but for a short time. Patrol No. 2, crossing the anchorage from West Seattle to Pier No. 1 at 1:17, also saw the Fuller.

Johanson, when asked the distance the Mexico was from the Fuller when he first saw her, said 400, 500, or 600 feet. Later he said 800 or 900 feet. The latter is the utmost distance claimed by him. He adds that it was "kind of dark and hazy." Again, he testified, when asked as to first seeing the Mexico:

"Well, back up toward that waterway; you could not see it very plain, any light, that was kind of foggy; but it was lined up the waterway somewhat east of Harbor Island."

If he was keeping an alert lookout, the fog is the only thing that will account for his not seeing the lights of the Mexico sooner. While the testimony of this witness is more or less contradictory, it fairly appears that he first saw the masthead light of the Mexico, and substantially at the same time her green light, later her red and green lights; that her green light then went out, and he saw her red light to the time of collision. His position on the Fuller was well back of the point of collision. He did not see her range light at the time of sighting her masthead light, and does not testify to having seen it at any time. The fact that, of her side lights, he first saw her green light, renders impossible the contention that his failure to see the range light was occasioned by her lights being in line. He probably did not see the range light because of fog—for the same reason that the pilot and captain of the Mexico did not see the aft anchor light of the Fuller.

The watchman on the Fuller, possibly to excuse himself from his duty to hail the Mexico, or ring his bell after he saw the masthead light and did not see the range light, testifies as to seeing the green side light. But, taking him at his word, the most reasonable explanation of that is that he did not see the range light because of fog, for, had the lights been in line, thereby intercepting the range light, he must then have known that the Mexico was headed directly for him, and should have given warning, for he had had experience enough to understand the importance and means of determining the course of an approaching vessel.

Libelants, in their answer to the cross-libel, aver that—

"For a period of approximately 15 minutes prior to the collision there had been no mist, or light, shifting fog, whatsoever north of the entrance of the East waterway, or in the vicinity of that portion of the Elliott Bay anchorage ground where the A. J. Fuller was anchored."

Capt. Bozarth, of the tug C. C. Cherry, testified to leaving Pier D with the tug Cherry at a quarter to 2; that, in crossing the anchorage to the West waterway, it was not foggy, but "it got a little misty."

A tendency is apparent upon the part of many of the witnesses, particularly those engaged in navigating boats about the bay on this night, to speak of the existence of "haze," "low-lying haze," and "smoke," and "a foggy condition," thereby avoiding the use of the statutory words "fog" and "mist." The reason for the requirement of a signal is the inability to see satisfactorily, and fine shades of distinction in descriptive terms should not be drawn. The Archie Crossman and the Gracie (D. C.) 106 Fed. 984.

"Fog, the name given to any distribution of solid or liquid particles in the surface layers of the atmosphere, which renders surrounding objects notably indistinct or altogether invisible according to their distance. * * *

"Two other words, 'mist' and 'haze,' are also in common use with reference to the deterioration of transparency of the surface layers of the atmosphere caused by solid or liquid particles, and in ordinary literature the three words are used almost according to the fancy of the writer. It seems possible to draw a distinction between mist and haze that would be fairly well supported by usage. Mist may be defined as a cloud of water particles at the surface of land or sea, and, would only occur when the air is nearly or actually saturated; that is, when there is little or no difference between the readings of the dry and wet bulbs. The word 'haze,' on the other hand, may be reserved for the obscuration of the surface layers of the atmosphere when the air is dry. * * *

"These words are used quite irrespective of the nature of the cloud, which interferes with effective vision and necessitates the special provision; the word 'mist' is seldom used in similar connection. We may thus define a fog as a surface cloud sufficiently thick to cause hindrance to traffic. It will be 'thick mist' if the cloud consists of water particles; a 'thick haze' if it consists of smoke or dust particles which would be persistent even in a dry atmosphere.

"It is probable that sailors would be inclined to restrict the use of the word to the surface clouds met with in comparatively calm weather, and that the obscurity of the atmosphere when it is blowing hard, and perhaps raining hard as well, should be indicated by the terms 'thick weather,' or 'very thick weather,' and not by 'fog'; but the term 'fog' would be quite correctly used on such occasions from the point of view of cautious navigation. If cloud, drizzling rain, or heavy rain cause such obscurity that passing ships are not visible within working distance, the sounding of a fog horn becomes a duty." The Encyclopaedia Britannica (11th Ed.).

Johanson, the watchman on the Fuller, testified to ringing the fog bell twice before the collision, the first time about 12:30 and again at 1:10, and each time for 10 or 15 minutes. Johanson said that his method of ringing the bell was to ring for half a minute with an intermission of 2 minutes, and that the mist cleared each time before he stopped, the last time 10 or 12 minutes before he saw the light of the Mexico. He further testified that, from the time he quit ringing the bell the last time to the time of the collision, it was "a little hazy, but wasn't foggy"; that, while ringing the bell the last time, he heard whistles of a steamer. This must have been the Mexico as she was coming down the waterway; but he says he could not tell where the whistles came from.

It is unquestioned, therefore, that there was fog in the anchorage a very few minutes before the collision. Within an hour prior to the collision, a bank of fog passed down the channel between the anchorage and the docks, and at the time of the collision had reached a point considerably north of the anchorage. There is testimony that the bank did not extend over the anchorage; but it is not of a very convincing nature.

At the time of the collision, another bank of fog had reached a point in this channel not more than half a mile to the southeast of where the Fuller was anchored. It was from this fog bank that the Mexico emerged just before making her turn across the anchorage prior to the collision. Although somewhat at variance with certain testimony of Pilot Beecher, it is reasonable to conclude that, in coming down the channel, the Mexico probably kept well to the west side of the channel, in order to keep off the pier heads. This would result in her not being more than half a mile from the Fuller when she emerged from the dense fog.

It is also shown that throughout the evening there was heavy fog in the East waterway and at times in the West waterway; that one of the patrol launches, in crossing the southerly part of the anchorage before midnight, encountered heavy fog off of Harbor Island. There is further testimony that, shortly prior to midnight, a fog was encountered by this launch about half a mile to the south and west of the Fuller, although its extent, density, and movement are not accurately described. That this fog remained in this locality until after the collision is rendered likely by the fact that the watchman on the Corruthers was unable to see the Fuller's lights at the time of the collision, as already noted, and the further fact that the captain of the tug C. C. Cherry did not notice the lights of the Mexico standing by after the collision, although within half a mile of her, prior to the time the Cherry's pump broke down, or during the 10 minutes that they were engaged in the repair of it, or until after he had started again on his course in the direction of the Mexico.

Half speed of the Mexico would be about 5½ knots. The fact that she increased to half speed at 1:28, and sighted the Fuller at 1:32 immediately ahead of her, coupled with the fact that she had not steered directly for the Fuller, but had executed the turn, substantiates the conclusion that she could not have been over half a mile from the Fuller when she came out of this fog bank.

The witness Harding testified that the Mexico did not blow fog signals for 2 or 3 minutes while in the fairway, nor until after she had passed from his vision, and until directly before he heard the crash. This evidence is corroborated by the manner in which claimant's witnesses testified as to the giving of fog signals, which claimant contends were continuously sounded. The pilot testified that the quartermaster was pulling the whistle cord. This is, in effect, testimony that he (the pilot) was not. The quartermaster testified that the pilot was pulling the whistle cord, which amounts to testimony that he (the quartermaster) was not.

·This discrepancy in the testimony over blowing the fog signals on the Mexico may be explained by the fact that they were only being blown when she was passing through a bank, and that, during the considerable time that she was coming down the waterway, both the pilot and quartermaster sounded fog signals, and that, they not having been sounded in the channel off the anchorage, the recollection of the pilot and quartermaster, stimulated by their bias afterwards, leads each of them to believe that the other was sounding the whistles regularly before the collision.

In view of the number of witnesses who have testified to two blasts being blown prior to the collision, there can be no question that such was the fact, although the watchman on the Fuller testifies that he heard no whistles. Unless this can be accounted for by excitement on his part on account of the imminence of the collision, or, an account of the subsequent excitement after the collision, he has forgotten the whistles, it·would lend color to the testimony of the witnesses on the Mexico that he was not on deck as the Mexico approached, but in the galley.

This failure to be sounding the fog whistle on the Mexico may be viewed in two aspects: First, as an admission that the weather condition was such as not to require that precaution; and, second, as added evidence of fault and negligence in the operation of the Mexico. Under the foregoing conditions, as shown, it must necessarily be considered as both. It was an admission that it was relatively clear, and was an added fault or negligence.

A number of witnesses on the patrol launches and two tugs testified as to its being clear over the anchorage. These men, particularly those on the patrol boats, made many trips each night about the bay, and were therefore familiar with their surroundings. These smaller boats would be easily and. quickly stopped and maneuvered to avoid a collision. A foggy condition that would be a menace in the operation of a large vessel, such as the Mexico would prove no embarrassment whatever in the navigation of a small launch. This, probably, accounts for the fact that these witnesses on the launches and tugs describe the condition over the anchorage as clear. The effect of this testimony is that, when they say that it was clear, they mean that it was clear enough for themselves, in the operation of their boats, to avoid danger. If it had not been foggy, more witnesses along the busy water front, even at that late hour of the night, should have seen the Mexico as she came down the channel and turned across the anchorage.

Libelants contend that the Fuller's lights were visible over the anchorage for half a mile, and that this condition dispensed with the necessity for ringing the fog bell on her. The court can neither agree with the premise nor the conclusion, for it is apparent, taking into account the distances at which those on the Mexico saw the lights on the Fuller and the watchman on the Fuller saw the lights on the Mexico, as testified, that ship lights were not visible in this portion of the anchorage over a quarter of a mile.

While it is not legal authority, the following table from the Encyclopedia Britannica (11th Ed.) vol. 1, p. 588, as to the effects and

traffic requirements in fog, is evidence of what is recognized as necessary on the part of those so engaged in the navigation of vessels (the italics are the court's):

| Name. | No. | On Land. | On Sea. | On River. |
|---|---|---|---|---|
| Slight fog or mist | 1 | Objects indistinct, but traffic by rail or road un-impeded. | Horizon invisible, but lights and landmarks visible at working distances. | Objects indistinct but navigation unimpeded. |
| Moderate fog | 2 | Traffic by rail requires additional caution. | *Lights, passing vessels and landmarks generally indistinct under a mile.* | *Navigation impeded, additional caution required.* |
|  | 3 | Traffic by rail or road impeded. | *Fog signals are sounded.* |  |
| Thick fog | 4 | Traffic by rail or road impeded. | Ship's lights and vessels invisible at ¼ mile or less. | Navigation suspended. |
|  | 5 | Traffic by rail or road totally disorganized. |  |  |

In daylight, if the condition as to visibility were such that one could not see half a mile, no mistake would be made in pronouncing it foggy; and if, at night, lights that ordinarily would be seen two miles cannot be seen half a mile, it is "foggy," as the word is ordinarily understood. The fact that passing signals are only to be given when vessels are within half a mile and in sight of each other does not affect the question, nor limit the range of visibility to within half a mile which would require the ringing of a fog bell. The law does not require the bell only when lights cannot be seen, but also when the foggy condition renders it liable that they may not be seen.

The Fuller was lying in the anchorage not over 1,000 feet from its east boundary, nor more than 600 feet from its north boundary; that is, she was in the northeast corner of the anchorage, which, on account of the way in which vessels turned in entering and leaving the East waterway, is the most exposed portion of the anchorage. That vessels anchored in this portion of the anchorage, at buoy No. 2, were exposed to collision with such passing vessels, is obvious, and that it was realized by shipping men is shown by the fact that, previous to the collision, one vessel had moved from that buoy for this reason. This fact would render the failure to sound fog signals on a vessel in this position a fault, which in other situations, in like fog, would not constitute a fault. The Mary Weaver (D. C.) 124 Fed. 977.

The foregoing shows that the Fuller was in fault, in that her fog bell was not being rung at and prior to the time of the collision. It being shown that the fog was thick enough to require the ringing of a

fog bell on the Fuller, it is only necessary to determine whether the failure to ring that bell was a contributing fault to the collision.

It is libelants' contention that, as the pilot of the Mexico knew the location of the Fuller, the failure to sound the bell cannot be held to have contributed to the collision. Finding, as I have done, that the Mexico got off of her course and failed to give the Fuller as wide a berth as the pilot intended, because his vessel swung more rapidly than he calculated, and that he thereby got off his course without his knowledge, it is obvious that, had the bell on the Fuller been rung during the two or more minutes prior to the collision, the pilot on the Mexico would have had an added warning and opportunity to have correctly determined his position and avoided the collision.

The fault was therefore a contributing one. The Etruria (D. C.) 139 Fed. 925. Both vessels were at fault, and the damages will be divided. The Rosaleen, 214 Fed. 252, 130 C. C. A. 622.